# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
May 8, 2012 Session

# FRED T. HANZELIK v. BOARD OF PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF TENNESSEE

**Direct Appeal from the Chancery Court for Hamilton County**
**No. 10-0717     Walter C. Kurtz, Senior Judge**

**No. E2011-01886-SC-R3-BP - Filed September 27, 2012**

This direct appeal involves a disciplinary proceeding against a Chattanooga lawyer arising out of his representation of two clients. A hearing panel of the Board of Professional Responsibility determined that the lawyer should be suspended from the practice of law for forty-five days. Following the lawyer's appeal to the Chancery Court for Hamilton County, the trial court upheld the lawyer's forty-five-day suspension after finding that the record supported the hearing panel's findings that the lawyer had attempted to bill one client twice, had breached his ethical obligations to another client, and had failed to cooperate with the Board of Professional Responsibility during its extended investigation into his conduct. On this appeal, the lawyer insists (1) that the evidence does not support the hearing panel's findings, (2) that the hearing panel erred by receiving into evidence a videotaped deposition given by one of his clients, (3) that the hearing panel failed to properly apply the American Bar Association Standards for Imposing Lawyer Sanctions, and (4) that the hearing panel failed to consider the discipline imposed on other lawyers for similar infractions. Based on our review of the record, we, like the trial court, affirm the hearing panel's decision to suspend the lawyer's license to practice law for forty-five days.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, GARY R. WADE, and SHARON G. LEE, JJ., joined.

Daniel J. Ripper, Chattanooga, Tennessee, for the appellant, Fred T. Hanzelik.

Sandy Garrett, Nashville, Tennessee, for the appellee, Board of Professional Responsibility of the Supreme Court of Tennessee.

## OPINION

### I.

Fred T. Hanzelik, a lawyer admitted to the bars of both Tennessee and Georgia, has been practicing law since 1976. He is a solo practitioner in Chattanooga with one clerical assistant. On May 6, 2005, the Board of Professional Responsibility ("Board") filed a petition for discipline against Mr. Hanzelik based on a complaint filed by Charlyne Epstein, the widow of one of Mr. Hanzelik's former clients, alleging that Mr. Hanzelik had attempted to bill her husband twice for the same legal services. On December 29, 2006, the Board filed a supplemental petition for discipline based on the complaints of two other former clients of Mr. Hanzelik, William Taylor and Dr. Loredo M. Lawsin. Mr. Taylor's complaint involved Mr. Hanzelik's fee in a divorce proceeding. Dr. Lawsin's complaint involved Mr. Hanzelik's representation in a divorce proceeding and in an employment dispute.

A hearing panel was not convened to hear the evidence regarding the Board's petitions until December 2008. The hearing panel received testimony and evidence regarding Ms. Epstein's and Mr. Taylor's complaints on December 18 and 19, 2008, and then conducted a hearing regarding Dr. Lawsin's complaint on January 26, 2010. We now summarize the evidence regarding Ms. Epstein's complaint, Dr. Lawsin's complaint, and Mr. Hanzelik's cooperation with the disciplinary counsel's investigation.[1]

### A.

Louis Epstein was a friend and professional colleague of Mr. Hanzelik. He retained Mr. Hanzelik to represent him in a lawsuit filed by his siblings regarding numerous rental properties owned and managed by the Epstein family. The case was settled in 2002, and Mr. Epstein agreed to pay his siblings $400,000. Mr. Epstein gave Mr. Hanzelik $483,000 to pay the settlement with his siblings and Mr. Hanzelik's $83,000 fee. Mr. Epstein died in February 2003, less than one month following the entry of the order dismissing the case.

Mr. Hanzelik's record-keeping procedures were rather haphazard. His assistant kept all his outstanding bills for services in a single accounts receivable file. Whenever a client paid a bill, the copy of Mr. Hanzelik's statement was removed from the file and destroyed. Occasionally, but not regularly, Mr. Hanzelik's assistant also placed a copy of Mr. Hanzelik's statement in the client's file. Mr. Hanzelik also kept some files on an office computer, but this computer had "crashed" prior to the hearing.

---

[1] Because the hearing panel determined that the Board had not sustained its complaint regarding Mr. Hanzelik's representation of Mr. Taylor, we need not recapitulate this evidence.

As the deadline for filing claims against Mr. Epstein's estate approached, and with Mr. Hanzelik out of town, Teri Oliver, Mr. Hanzelik's assistant, became concerned that Mr. Hanzelik's fee for the Epstein settlement had not been paid. On July 25, 2003, after Mr. Hanzelik failed to return her telephone calls or emails, Ms. Oliver filed a $59,653.22 claim against Mr. Epstein's estate for "services rendered." When questioned at the hearing, Ms. Oliver could not recall how she calculated the rather precise figure of $59,653.22 but speculated that it could have been based on a digital spreadsheet stored on Mr. Hanzelik's "crashed" computer.

On August 26, 2003, Jerre Mosley, the attorney for Mr. Epstein's estate, filed an exception to Mr. Hanzelik's claim because he believed it to be erroneous. According to Mr. Mosley, he and Mr. Hanzelik "had a few telephone calls" and "saw each other" about the matter. On the morning of October 29, 2003, Mr. Mosley received an email from Mr. Hanzelik stating, "What do I need to do to get paid?" Mr. Mosley responded as follows:

> Fred:
>
> I've asked you several times to provide me with your billings so I could discuss them with Charlyne. You filed a claim for $59,000 with no supporting documentation, and Charlyne says she has never seen a bill.
>
> Charlyne is also under the impression that you've already been paid. The Settlement Agreement, which I also asked for and haven't received, was for Louis to pay $400,000 to the siblings, plus an additional $9,000 to two others, each. It looks like approximately $480,000 was paid to you to cover the settlement and your fee. Charlyne personally paid the $18,000 for the other two siblings, so the question is what happened to the other $80,000 and how was it applied?
>
> If I can get information with an explanation of how the $80,000 was disbursed, we can see about getting you paid.

Later, on the afternoon of October 29, 2003, Mr. Hanzelik responded as follows, "I asked my bookkeeper about the transaction. She was embarrassed. It was paid out of the proceeds and for an additional case." On October 31, 2003, six days before the scheduled hearing, Mr. Hanzelik wrote Mr. Mosley again, stating that he "withdrew the claim rather than it being denied."

Mr. Hanzelik's explanations caused Mr. Mosley to become concerned that Mr. Hanzelik had overbilled Mr. Epstein. Accordingly, Mr. Mosley asked Mr. Hanzelik to provide him with a full accounting for the original $83,000 fee. On January 15, 2004, after Mr. Hanzelik had not responded, Mr. Mosley wrote to Mr. Hanzelik, asking "[a]re you going to respond to my letters? I'm being pressured to do something [and] you're not helping by not responding. Please give this your immediate attention." When Mr. Hanzelik finally responded, he told Mr. Mosley that "[t]he file is in closed storage" and provided him with a brief summary of how Mr. Epstein's settlement money had been used. Ms. Epstein filed her complaint with the Board on March 1, 2005. On May 6, 2005, the Board filed a petition for discipline based on this complaint.

**B.**

In late March or early April 2005, Dr. Lawsin, a nephrologist, retained Mr. Hanzelik to represent him in a divorce proceeding expected to be filed in Tennessee. On April 7, 2005, in response to Mr. Hanzelik's request for a retainer, Dr. Lawsin paid him $3,500. On May 18, 2005, Dr. Lawsin paid Mr. Hanzelik an additional $5,000. Dr. Lawsin later testified that Mr. Hanzelik never offered him a written retainer agreement or contract of any kind. Mr. Hanzelik insisted that a written agreement existed at one time but that he had lost it when his computer crashed.

Dr. Lawsin and Mr. Hanzelik had different explanations regarding the $5,000 retainer. Dr. Lawsin stated that he had been terminated from his employment in April 2005 amid allegations of misconduct and that the $5,000 was a retainer in return for Mr. Hanzelik's agreement to assist him in filing suit against his former employer and a hospital. For his part, Mr. Hanzelik stated that the $5,000 payment was an additional retainer in the divorce matter. He explained that, after he received the $3,500 retainer, he discovered that Dr. Lawsin's wife had already filed a divorce action in Atlanta and that he requested the additional retainer because of the additional time and expenses connected with litigating the divorce in Atlanta rather than in Tennessee.

The evidence presented to the hearing panel regarding Dr. Lawsin's suit against his former employer and the hospital reveals that Mr. Hanzelik and Dr. Lawsin were not on the same page. Dr. Lawsin's emails to Mr. Hanzelik between June 2005 and May 2006 reflect his belief that Mr. Hanzelik was planning to pursue this claim, as well as his concern over the delay in filing suit. For his part, Mr. Hanzelik claimed that Dr. Lawsin's lawsuits against his supervising physician and the hospital would have been frivolous and that he never intended to file them. However, it appears that Mr. Hanzelik did not advise Dr. Lawsin about his assessment of the merits of Dr. Lawsin's proposed lawsuits until an email dated May 10, 2006, in which he suggested that Dr. Lawsin should "think twice" before suing the hospital

-4-

because the hospital was interested in suing him. By this time, the statute of limitations on at least one of Dr. Lawsin's claims had expired.

Communications between Dr. Lawsin and Mr. Hanzelik regarding the divorce proceeding were also problematic. The difficulties can be explained, in part, by Dr. Lawsin's employment with the United States Army which took him to Germany and Washington, D.C., and by Dr. Lawsin's desire to reconcile with his wife, as well as his reluctance to comply with discovery requests in the divorce proceeding.

Dr. Lawsin's wife filed a motion to compel discovery in October 2005. When Dr. Lawsin did not comply with this order, his wife requested the divorce court to sanction him. The court entered an order on April 4, 2006, directing Dr. Lawsin to appear in court on April 27, 2006. When Dr. Lawsin failed to appear, the divorce court held him in contempt. Mr. Hanzelik did not appear in any of these proceedings on Dr. Lawsin's behalf and did not inform Dr. Lawsin of any of these motions or orders.

On May 8, 2006, Dr. Lawsin discharged Mr. Hanzelik as his lawyer in the divorce proceeding. Three days later, on May 11, he filed a complaint with the Board's Consumer Assistance Program. Dr. Lawsin asserted in this complaint that Mr. Hanzelik had abandoned him and that he had accepted retainer fees in the amount of $8,500 without performing the requested legal services. On September 29, 2006, the Board filed a supplemental petition for discipline based, in part, on Dr. Lawsin's complaint.

## C.

The Board's disciplinary counsel began investigating Dr. Lawsin's complaint in July 2006. On August 25, 2006, disciplinary counsel requested Mr. Hanzelik to produce his fee agreement with Dr. Lawsin and to provide itemized statements regarding Mr. Hanzelik's representation of Dr. Lawsin. By November 9, 2006, disciplinary counsel had sent Mr. Hanzelik seven letters, but Mr. Hanzelik had failed to satisfactorily answer any of them. Mr. Hanzelik eventually submitted materials relating to his representation of Dr. Lawsin, but these materials contained no fee agreements or statements regarding his work related to Dr. Lawsin's divorce.

On June 16, 2008, disciplinary counsel filed a "Motion that Facts be Taken as Established" with regard to Dr. Lawsin's complaint. Mr. Hanzelik responded to the motion on June 30, 2008, stating that he was attaching to his response a "reconstructed time [sheet] just completed." However, no such accounting was actually attached to Mr. Hanzelik's response. It was not until the January 26, 2010 hearing that Mr. Hanzelik finally produced a reconstructed account of his time spent representing Dr. Lawsin.

Disciplinary counsel also desired to depose Dr. Lawsin by teleconference and to use his deposition testimony at the disciplinary hearing. On September 9, 2009, the hearing panel granted disciplinary counsel permission to depose Dr. Lawsin in Florida, where he was then living. On October 5, 2009, disciplinary counsel notified Mr. Hanzelik that Dr. Lawsin would be deposed by teleconference on October 12, 2009, and then began making arrangements for the remote video deposition with Dr. Lawsin in Florida, Mr. Hanzelik in Chattanooga, and disciplinary counsel in Nashville.

On October 12, 2009, the day the deposition was scheduled, Mr. Hanzelik filed a motion for a protective order and a motion to quash, arguing that Tenn. R. Civ. P. 30.02 required at least seven days notice before taking an out-of-county deposition. Disciplinary counsel proceeded with the deposition, and Mr. Hanzelik did not participate, despite knowing when and where he could participate in the deposition in Chattanooga. The hearing panel denied Mr. Hanzelik's motions on October 20, 2009. However, it decided to permit Mr. Hanzelik to depose Dr. Lawsin at his own expense for the purposes of cross-examination. The hearing panel also decided that Mr. Hanzelik could object to the introduction of the deposition by filing a motion in limine thirty days before the date of the final hearing.

Mr. Hanzelik did not attempt to depose Dr. Lawsin and did not file a timely motion in limine. Disciplinary counsel offered Dr. Lawsin's deposition as evidence at the January 26, 2010 hearing, and the panel admitted the deposition over Mr. Hanzelik's objection. The hearing panel explained that Mr. Hanzelik had waived his objection to the deposition because he had not availed himself of the opportunity to depose Dr. Lawsin and because he had failed to file a timely motion in limine.

The hearing panel filed its opinion on June 11, 2010.[2] While the hearing panel dismissed Mr. Taylor's complaint, it found that Mr. Hanzelik had violated Tenn. Sup. Ct. R. 8, RPC 1.5 by attempting to charge both Mr. Epstein and his estate for the same legal services and that he had violated Tenn. Sup. Ct. R. 8, RPC 1.3, 1.4, 1.5, and 3.2 in connection with his representation of Dr. Lawsin. In addition, the hearing panel found that Mr. Hanzelik had violated Tenn. Sup. Ct. R. 8, RPC 8.1 by failing to provide complete and timely responses with regard to the complaints filed against him. The hearing panel also determined that Mr. Hanzelik should be suspended from the practice of law for forty-five days. Mr.

---

[2]We note with concern that more than five years elapsed between the filing of the initial complaint for discipline and the entry of the hearing panel's order. We are not unmindful of the pragmatic challenges caused by schedule conflicts, obtaining evidence from non-resident witnesses, and health issues. It is likewise not lost on us that lawyers facing discipline may be inclined to postpone the disposition of the charges against them as long as possible. Despite these, and other, delay-causing circumstances, we again point out that it is in the best interests of the lawyer, the lawyer's clients, and the legal system to resolve complaints filed under Tenn. Sup. Ct. R. 9 as expeditiously as possible.

Hanzelik appealed the hearing panel's decision to the Chancery Court for Hamilton County. On July 15, 2011, the trial court filed its memorandum and order affirming the hearing panel's decision.

On this appeal pursuant to Tenn. Sup. Ct. R. 9, § 1.3, Mr. Hanzelik argues (1) that the record does not support the hearing panel's findings with regard to the substantive violations of the Rules of Professional Conduct, (2) that the hearing panel erred by permitting disciplinary counsel to introduce the videotaped deposition of Dr. Lawsin, (3) that the hearing panel did not properly apply the American Bar Association Standards for Imposing Lawyer Sanctions, and (4) that the forty-five-day suspension imposed by the hearing panel was inconsistent with the punishment imposed on other lawyers in similar circumstances. Like the trial court, we affirm the hearing panel's decision.

## II.

At the outset, we will address Mr. Hanzelik's challenge to the hearing panel's decision to permit disciplinary counsel to introduce Dr. Lawsin's videotaped deposition. Because decisions regarding the admissibility of evidence are discretionary, we must review the hearing panel's decision using the deferential "abuse of discretion" standard. *See State v. Turner*, 352 S.W.3d 425, 428 (Tenn. 2011); *Sanford v. Waugh & Co.*, 328 S.W.3d 836, 847 (Tenn. 2010).

The abuse of discretion standard does not give reviewing courts a license to second-guess the lower tribunal's decisions. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011). A tribunal abuses its discretion "when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted).

While Mr. Hanzelik had actual notice of the time and place of Dr. Lawsin's deposition, disciplinary counsel's notice of taking Dr. Lawsin's deposition did not comply with all the requirements of Tenn. R. Civ. P. 30.02. Mr. Hanzelik could have filed an objection to this deposition earlier than the day the deposition was scheduled to be taken, but he did not. By the same token, he could have filed a timely motion in limine requesting the hearing panel to exclude the deposition, but again, he did not.

While we understand Mr. Hanzelik's reluctance to schedule a second deposition at his own expense to cross-examine Dr. Lawsin, we find that Mr. Hanzelik's failure to file a prompt written objection to the adequacy of the notice of the deposition amounted to a waiver of the objection under Tenn. R. Civ. P. 32.04(1). By the same token, we find, in accordance with Tenn. R. App. P. 36(a), that Mr. Hanzelik failed to act to prevent the

harmful effect of an error when he failed to depose Dr. Lawsin or to file a motion in limine as the hearing panel had invited him to do. Accordingly, we decline to find that the hearing panel abused its discretion by allowing disciplinary counsel to introduce Dr. Lawsin's deposition at the hearing on January 26, 2010.

### III.

Mr. Hanzelik also insists that the record does not support the hearing panel's conclusions (1) that his conduct with regard to Mr. Epstein and his estate violated Tenn. Sup. Ct. R. 8, RPC 1.5, (2) that his conduct with regard to representing Dr. Lawsin violated Tenn. Sup. Ct. R. 8, RPC 1.3, 1.4, 1.5, and 3.2, and (3) that Mr. Hanzelik's lack of cooperation with the Board's investigation violated Tenn. Sup. Ct. R. 8, RPC 8.1. The Board responds that the record contains substantial and material evidence supporting the hearing panel's conclusions. We agree.

### A.

This Court is the final and ultimate arbiter of the propriety of the professional conduct of all lawyers practicing in Tennessee. *Flowers v. Board of Prof'l Responsibility,* 314 S.W.3d 882, 891 (Tenn. 2010); *Sneed v. Board of Prof'l Responsibility*, 301 S.W.3d 603, 612 (Tenn. 2010). Accordingly, when we are called upon to review judgments in disciplinary proceedings against lawyers, we do so in light of our fundamental and inherent power to promulgate, administer, and enforce the rules governing the licensing and professional conduct of lawyers practicing in Tennessee. *Rayburn v. Board of Prof'l Responsibility*, 300 S.W.3d 654, 660 (Tenn. 2009).

When a lawyer seeks judicial review of a hearing panel's decision, the trial court's "review shall be on the transcript of the evidence before the hearing panel and its findings and judgment." Tenn. Sup. Ct. R. 9, § 1.3. If either the lawyer or disciplinary counsel appeals to this Court, our review of the issues raised is based upon the record of the proceedings before the trial court, which shall include the transcript of evidence before the hearing panel. Like the trial court, we

> may affirm the decision of the panel or remand the case for further proceedings. [We] may reverse or modify the decision if the rights of the petitioner have been prejudiced because the panel's findings, inferences, conclusions or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5)

unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Sup. Ct. R. 9, § 1.3; *see also Lockett v. Board of Prof'l Responsibility,* ___ S.W.3d ___, ___, 2012 WL 2550586, at *5 (Tenn. July 3, 2012). In determining whether substantial and material evidence supports the hearing panel's decision, the reviewing courts evaluate whether the evidence "furnishes a reasonably sound factual basis for the decision being reviewed." *Sneed v. Board of Prof'l Responsibility*, 301 S.W.3d at 612 (quoting *Threadgill v. Board of Prof'l Responsibility*, 299 S.W.3d 792, 807 (Tenn. 2009), *overruled on other grounds by Lockett v. Board of Prof'l Responsibility*, ___ S.W.3d at ___, 2012 WL 2550586, at *7).

**B.**

The hearing panel found that Mr. Hanzelik had filed an invalid claim for $59,653.22 against Mr. Epstein's estate and that he had failed to withdraw the claim for several months. The panel concluded that this conduct violated Tenn. Sup. Ct. R. 8, RPC 1.5, which provides that a lawyer shall not "charge or collect an unreasonable fee or an unreasonable amount for expenses." Certainly, billing a client whose account has already been paid in full would constitute collecting an "unreasonable fee."

Mr. Hanzelik insists that the record contains insufficient evidence to support the hearing panel's conclusion. It is undisputed that Mr. Hanzelik received payment in full for his work on behalf of Mr. Epstein when he received and retained $83,000 of the $483,000 he had received from Mr. Epstein. Mr. Hanzelik acknowledges that the claim his assistant filed against the Epstein estate for $59,653.22 was never actually owed to him. However, Mr. Hanzelik argues that this claim was simply a mistake on the part of his assistant, and that he corrected the mistake as soon as it came to his attention. According to Mr. Hanzelik, he simply failed to notice the exception to the claim that had been filed by Mr. Epstein's estate in August 2003. He insists that he did not look into the validity of his claim against the estate until he received the email from Mr. Mosley on October 29, 2003.

Contrary to Mr. Hanzelik's assertions, the record contains substantial and material evidence that Mr. Hanzelik knew that his office had filed an invalid claim against Mr. Epstein's estate long before October 29, 2003, and that he was pursuing payment of this claim. Mr. Mosley testified without contradiction that he and Mr. Hanzelik exchanged "a few" telephone calls and perhaps had one meeting about this claim. Despite the fact that Mr. Mosley asked him several times for billings or other evidence to support the claim, Mr. Hanzelik provided no documentation to Mr. Mosley. Instead, as late as October 29, 2003, Mr. Hanzelik was asking "[w]hat do I need to do to get paid?"

Mr. Hanzelik did not abandon his effort to collect more money from Mr. Epstein's estate until Mr. Mosley confronted him with the evidence from Ms. Epstein that his bill had already been paid in full. This evidence provides an adequate factual foundation for the hearing panel's conclusions (1) that Mr. Hanzelik made "active efforts" to get paid by Mr. Epstein's estate, "knowing that he had already been paid in full for his services" and (2) that this violation was aggravated by Mr. Hanzelik's refusal to supply information to Ms. Epstein's attorney, Mr. Mosley, that would have exposed that the claim against the estate was invalid.

The fact that the claim was filed by Mr. Hanzelik's assistant is no defense. Under Tenn. Sup. Ct. R. 8, RPC 5.3, a lawyer is deemed to be responsible for the conduct of his non-lawyer assistants if the lawyer either ratifies that conduct or has direct supervisory authority over the assistant and fails to take reasonable remedial action when the assistant violates one of the rules.

Here, Mr. Hanzelik's assistant billed Mr. Epstein's estate for the same services for which Mr. Hanzelik had already been paid in violation of Tenn. Sup. Ct. R. 8, RPC 1.5. The fact that an exception had been filed against this claim in August 2003 and that Mr. Mosley had repeatedly asked Mr. Hanzelik to justify the bill before their mutual emails on October 29, 2003, demonstrates that Mr. Hanzelik knew the claim had been filed and had reason to know it was illegitimate. Furthermore, Mr. Hanzelik's demand for payment in his October 29, 2003 email to Mr. Mosley amounts to a ratification of his assistant's conduct in filing the claim. Mr. Hanzelik failed to take remedial action until he withdrew the claim in late October, shortly before the claim dispute was set for a hearing. Under these facts, our rules hold Mr. Hanzelik responsible for filing this invalid claim and breaching his duty to charge only reasonable fees.

## C.

The hearing panel also determined that the manner in which Mr. Hanzelik handled the legal matters entrusted to him by Dr. Lawsin violated Tenn. Sup. Ct. R. 8, RPC 1.3, 1.4, 1.5, and 3.2. As they relate to this proceeding, Tenn. Sup. Ct. R. 8, RPC 1.3 and 3.2 respectively require lawyers to "act with reasonable diligence and promptness in representing a client" and to "make reasonable efforts to expedite litigation." Tenn. Sup. Ct. R. 8, RPC 1.4(a) requires lawyers to keep their clients "reasonably informed about the status of the matter [and to] promptly comply with reasonable requests for information." Similarly, Tenn. Sup. Ct. R. 8, RPC 1.4(b) requires lawyers to explain matters to their clients "to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Finally, Tenn. Sup. Ct. R. 8, RPC 1.5 directs lawyers not to charge or collect an "unreasonable fee or an unreasonable amount for expenses."

**Mr. Hanzelik's Communications with Dr. Lawsin**

The record contains substantial and material evidence supporting the hearing panel's conclusion that Mr. Hanzelik did not take reasonable steps to keep Dr. Lawsin informed regarding the status of his divorce proceedings and the viability of his proposed employment termination lawsuit, even taking into account Dr. Lawsin's travel while this litigation was pending. First, Mr. Hanzelik failed to keep Dr. Lawsin reasonably informed about the status of his divorce proceedings. Although Dr. Lawsin appears to have been recalcitrant himself in responding to discovery orders, Mr. Hanzelik failed to convey critically important information to his client. Dr. Lawsin testified that Mr. Hanzelik never told him about the requests for discovery that required answers, the motion for sanctions, or the order directing him to appear in court in Atlanta on April 27, 2006.

Second, the record suggests that Mr. Hanzelik failed to respond to Dr. Lawsin's reasonable requests for information within a reasonable time. In his emails, Dr. Lawsin repeatedly asks Mr. Hanzelik for updates on his investigations into Dr. Lawsin's potential lawsuit against his former employers. Dr. Lawsin testified that Mr. Hanzelik was "not responsive at all" to his emails and "multiple phone calls" concerning the status of his employment dispute. Dr. Lawsin's emails also capture his frustration that Mr. Hanzelik would not account for how his fees were being used.[3] Had Mr. Hanzelik complied with these

_____

[3]In an email sent June 17, 2005, for example, Dr. Lawsin tells Mr. Hanzelik that he is "disappointed in the lack of action in this matter." The email states:

> From the very start in early April, you sat down with my parents and I and agreed to represent me in this matter. The first meeting I gave you copies of my employment agreements, termination letter, hospital memos, etc. You offered to review my written responses to the harrassment cases but didn't do so even though I emailed them to you several days before they were due.

Dr. Lawsin told Mr. Hanzelik that if he was "too busy" or "not interested" in filing suit, then he "should not have accepted the case verbally in early April or asked for an additional retainer fee of $5,000 in mid-May."

On November 7, 2005, Dr. Lawsin again emailed Mr. Hanzelik:

> Fred,

> Yes, I would call the fact that you hadn't returned my phone calls, emails, faxes since late June abandonment. I even emailed you last week regarding my divorce situation with [my wife], but I did not get a response from you. I don't know who told you to stop all work on my hospital matters. I've only been asking you to *start* working on it since we first met in April 05, but you kept putting me and my mother off saying you would do it in the next week or so. As my attached emails show, the situation with the hospital has gotten out of

(continued...)

reasonable requests within a reasonable time, the record in this case would doubtless have been different.

Third, Mr. Hanzelik failed to share with Dr. Lawsin, in a reasonable time, his legal opinion concerning the viability of Dr. Lawsin's potential lawsuit against his former employers. It was not until May 10, 2006, that Mr. Hanzelik told Dr. Lawsin in an email that he would "think twice" before suing the hospital, because "[t]hey want to sue you." By this time, Mr. Hanzelik had represented Dr. Lawsin for more than a year, the statute of limitations on at least one of his potential claims had expired, and Dr. Lawsin had fired Mr. Hanzelik and hired a new attorney. Although Mr. Hanzelik testified that Dr. Lawsin's potential lawsuit appeared frivolous from the beginning, Mr. Hanzelik never explained his doubts regarding the viability of these claims "to the extent reasonably necessary" to allow Dr. Lawsin to "make informed decisions" regarding this claim. The hearing panel's findings concerning lawyer-client communication are indeed supported by substantial and material evidence.

## Mr. Hanzelik's Diligence

The hearing panel found that Mr. Hanzelik harmed Dr. Lawsin by failing to make sure that he complied with the Georgia court's orders in the divorce proceeding. This lack of diligence eventually led to Dr. Lawsin being charged with contempt. Mr. Hanzelik also harmed Dr. Lawsin by failing either to pursue Dr. Lawsin's lawsuit against his employers or

---

[3](...continued)
control. [The hospital] has called a collection agency on me and I'm almost to the point of declaring bankruptcy. So again, yes I feel let down and abandoned.

Dr. Lawsin continued,

To mine and my mother's understanding, the $5,000 was a retainer for my case with [my supervising physician] and [the hospital] and because you were not filing on my behalf, I requested you to return it. Of course you may keep it if you'd file for me as we have requested. . . . Please file a lawsuit against both [the hospital] and [my supervising physician] as I have instructed you in the past and update me with your progress . . . I will not report you to either the GA or TN Bar association if you resume work on my legal matters as we discussed originally in April 05. I hope to put all the miscommunications and misunderstandings behind us and move forward . . . .

Later that month, Dr. Lawsin again emailed Mr. Hanzelik, asking him to "file suit against [my supervising physician] for a) failure to pay me for my last 5 weeks of employment, b) improper termination, c) breach of contract, and d) 3 months of severance pay." Dr. Lawsin also asked Mr. Hanzelik to "investigate" whether he had any grounds to sue the hospital for "slander" and "breach of confidentiality" in the way it handled the harassment complaints against him.

to tell Dr. Lawsin that he would not file the lawsuits before the statute of limitations on one of the potential claims expired.

Mr. Hanzelik attributed his apparent lack of diligence to Dr. Lawsin. He insisted that Dr. Lawsin "moved a lot" and that Dr. Lawsin was also reluctant to respond to discovery requests for personal reasons. The trial court observed that the hearing panel was "aware of the communication problems" between Mr. Hanzelik and Dr. Lawsin. Nevertheless, the trial court agreed with the hearing panel that Mr. Hanzelik "significantly overstated the facts in placing the majority of the fault on his client." The communication difficulties did not excuse Mr. Hanzelik's failure to appear in court or to inform Dr. Lawsin of "the adverse action – including contempt – that had been taken against him." Although Mr. Hanzelik was not required to prosecute Dr. Lawsin's lawsuit, if it was indeed frivolous, "the claim should have been investigated and the client accurately informed as to the progress on the case."

The fact that Dr. Lawsin may have been a difficult client does not excuse Mr. Hanzelik from failing to pursue Dr. Lawsin's matters with reasonable diligence. Allowing a client to be held in contempt of court due to poor communication is not diligent representation. Likewise, allowing a client to mistakenly assume that a requested lawsuit is being prepared for filing when there is no intention to do so is not consistent with a lawyer's obligation to act with reasonable promptness in representing a client or to make reasonable efforts to expedite litigation. The hearing panel's findings concerning these issues are supported by evidence which is both substantial and material in the light of the entire record.

### The Fees Mr. Hanzelik Charged Dr. Lawsin

The hearing panel found that Mr. Hanzelik violated Tenn. Sup. Ct. R. 8, RPC 1.5, which states that a lawyer shall not charge or collect an "unreasonable fee or an unreasonable amount for expenses." Although it found that the total retainer fee of $8,500 was "not in and of itself excessive," the hearing panel took issue with Mr. Hanzelik's failure to communicate "the basis or rate of the fee he intended to charge [Dr.] Lawsin." The panel stated:

> There was no engagement letter, no fee schedule provided to the client, and nothing other than a demand for payment of [the initial retainer fees]. . . . A written engagement letter, setting forth the terms and scope of the representation, and the fees to be charged, should have been provided to the client.

Although the Rules of Professional Conduct do not absolutely require a fee agreement to be in writing, they strongly encourage it. Tenn. Sup. Ct. R. 8, RPC 1.5(a)(10) provides that one of the criteria for ascertaining the reasonableness of a fee is "whether the fee agreement is in writing." Similarly, Tenn. Sup. Ct. R. 8, RPC 1.5(b) states that "the basis or

rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing."

Dr. Lawsin testified that he "never received any accounting" from Mr. Hanzelik. He also testified that he "never received any contract" identifying "what services we were supposed to agree upon." Dr. Lawsin said Mr. Hanzelik "never gave me a written agreement to sign or review. He just asked for retainer fees." Dr. Lawsin's testimony, together with his emails expressing his frustration over the $5,000 retainer not being used in his employment termination lawsuit, provides substantial and material evidence that Mr. Hanzelik's fees were not sufficiently "communicated to the client," and were thus unreasonable under the circumstances. This entire case against Mr. Hanzelik illustrates the drafters' Commentary to Rule 1.5, that "[a] written statement concerning the terms of the engagement reduces the possibility of misunderstanding." Tenn. Sup. Ct. R. 8, RPC 1.5 cmt.

**D.**

Finally, the hearing panel concluded that Mr. Hanzelik's torpid responses to disciplinary counsel's repeated requests for information violated Tenn. Sup. Ct. R. 8, RPC 8.1. With regard to disciplinary matters, this rule provides that lawyers shall not "knowingly make a false statement of material fact" or "knowingly fail to respond to a lawful demand for information from . . . [a] disciplinary authority." Tenn. Sup. Ct. R. 8, RPC 8.1.

The basis for the hearing panel's findings was Mr. Hanzelik's "dilatory tactics and refusal to provide the accounting of the retainer fees . . . or to document his fee arrangement" with Dr. Lawsin. The hearing panel noted that "[t]he record is clear that [Mr.] Hanzelik repeatedly and consistently failed to respond to [d]isciplinary [c]ounsel's request for information both prior to the filing of the Petition and during the formal discovery process." The hearing panel also found that Mr. Hanzelik "never responded" to the Board's demands for information and "failed to produce any documentation explaining his charges, fee structure, or application of the retainers."

Mr. Hanzelik's assertions that he tried to cooperate with the Board and that most of the communications between him and disciplinary counsel were by telephone conflict with the testimony of Disciplinary Counsel James Vick and with the unanswered written correspondence from Mr. Vick to Mr. Hanzelik contained in the record. The prolonged duration of this investigation suggests that Mr. Hanzelik's sluggish compliance was indeed "dilatory." The record contains substantial and material evidence that Mr. Hanzelik was not cooperating with the Board.

-14-

**IV.**

As a final matter, Mr. Hanzelik argues that the forty-five-day suspension of his law license is not an appropriate punishment under the American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards")[4] and that it is disproportionate to sanctions imposed on other lawyers for similar conduct. The ABA Standards provide guidelines for determining the appropriate level of discipline for lawyer misconduct. *Lockett v. Board of Prof'l Responsibility*, ___ S.W.3d at ___, 2012 WL 2550586, at *6; *see also* Tenn. Sup. Ct. R. 9, § 8.4. They also promote the "consideration of *all factors* relevant to imposing the appropriate level of sanction in an individual case." *Lockett v. Board of Prof'l Responsibility*, ___ S.W.3d at ___, 2012 WL 2550586, at *7 (quoting ABA Standard 1.3). In this case, the hearing panel expressly considered ABA Standards 2.3, 3, 4.41, 4.42, 7.1, and 9.22. The trial court considered ABA Standards 4.42 and 6.12 to be particularly relevant.

ABA Standard 4.42 states that suspension is generally appropriate for lack of diligence when a lawyer "knowingly fails to perform services for a client and causes injury or potential injury to a client," or when a lawyer "engages in a pattern of neglect and causes injury or potential injury to a client." ABA Standard 6.12 also states that

> [s]uspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

The record in this case reflects (1) that Mr. Hanzelik knowingly billed both Mr. Epstein and his estate for the same legal services, (2) that he exhibited a "pattern of neglect" toward Dr. Lawsin's legal matters and failed to "perform services" for Dr. Lawsin, and (3) that his "dilatory tactics" obstructed the Board's investigation. In light of this conduct, we find that the suspension of Mr. Hanzelik's license to practice law is not an arbitrary and capricious application of the ABA Standards. Tenn. Sup. Ct. R. 9, § 4.2 states that: "[n]o suspension shall be ordered for a specific period less than thirty days or in excess of five years." Mr. Hanzelik's forty-five-day suspension lies at the low end of this spectrum. The hearing panel did not abuse its discretion by imposing this penalty.

---

[4]American Bar Association, *Standards for Imposing Lawyer Sanctions* (2005), *available at* http://www.americanbar.org/content/dam/aba/migrated/cpr/regulation/standards_sanctions.authcheckdam .pdf.

We have previously held that, for the sake of consistency and uniformity, we will "consider the sanctions that have been imposed in prior cases that present similar circumstances." *Board of Prof'l Responsibility v. Maddux*, 148 S.W.3d 37, 40 (Tenn. 2004) (citing Tenn. Sup. Ct. R. 9, § 8.4). Here, the record does not contain any comparable circumstances from any jurisdiction. Mr. Hanzelik apparently attempted to proffer five of the Board's press releases in other cases for the trial court's consideration. The trial court declined to consider these press releases because they dealt with matters outside the record. The forty-five-day suspension of Mr. Hanzelik's license to practice law comports with Tenn. Sup. Ct. R. 9 and the ABA Standards. We find nothing in the record that provides a basis for concluding that Mr. Hanzelik's suspension is inconsistent with the discipline meted out in similar cases.

## V.

We affirm the trial court's decision to suspend Mr. Hanzelik from the practice of law for forty-five days. The costs of this appeal are taxed to Fred T. Hanzelik and his surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUSTICE

-16-