# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### January 8, 2015 Session

## YARBORO SALLEE v. TENNESSEE BOARD OF PROFESSIONAL RESPONSIBILITY

**Appeal from the Chancery Court for Knox County**
**No. 1840281     Don R. Ash, Judge**

---

**No. E2014-01062-SC-R3-BP - Filed July 23, 2015**

---

In this appeal from attorney disciplinary proceedings, the hearing panel of the Tennessee Board of Professional Responsibility suspended the law license of the appellant attorney for one year. The hearing panel determined that the attorney violated Rules 1.4, 1.5, 1.16, 4.4, and 8.4 of the Tennessee Rules of Professional Conduct. Its decision was based on, *inter alia*, the attorney's failure to communicate with the client, excessive fees, withholding items from the client's files after termination of her representation, and sending the clients' new attorney emails threatening criminal prosecution of the former clients. The attorney sought judicial review of the hearing panel's decision, and the trial court affirmed the decision of the hearing panel. The attorney now appeals to this Court. After a careful review of the record, we affirm.

**Appeal Pursuant to Tenn. Sup. Ct. R. 9, § 1.3; Judgment of the Trial Court Affirmed**

HOLLY KIRBY, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK, GARY R. WADE, and JEFFREY S. BIVINS, JJ., joined.

Appellant Yarboro Sallee, Knoxville, Tennessee, self-represented.[1]

A. Russell Willis, Brentwood, Tennessee, for the appellee, Board of Professional Responsibility of the Supreme Court of Tennessee.

## OPINION

---

[1] Ms. Sallee was represented by counsel before the Tennessee Board of Professional Responsibility and in the trial court, but is self-represented on appeal to this Court.

## Factual and Procedural Background

Appellant Yarboro Sallee obtained her license to practice law in Tennessee in 1994. For approximately eighteen years, she practiced law in Anderson County and surrounding areas without disciplinary incident.

The case that prompted this disciplinary complaint arose from a tragic occurrence. On October 15, 2009, Lori Noll fell down steps in her home. She died five days later. Ms. Noll was a wife, mother of two children, and the daughter of the claimants in this case, Frances Rodgers and Vearl Bible (collectively, the "Claimants"). Despite a medical examiner's finding that the death was accidental, the Claimants suspected that their daughter's husband, Adam Noll, was responsible for her death, motivated by a one-million dollar insurance policy on Ms. Noll's life. A close friend of the Claimants recommended Attorney Sallee to advise them on their legal options.

On September 18, 2010, the Claimants had an initial meeting with Attorney Sallee, to discuss the feasibility of a wrongful death action on behalf of their deceased daughter. Attorney Sallee offered to investigate the matter. At this initial meeting, Attorney Sallee did not discuss her compensation with the Claimants, beyond telling them that she would not charge them a fee if her investigation failed to reveal anything suspicious.

A few days later, on September 21, 2010, Attorney Sallee met with the Claimants to discuss the 911 call Mr. Noll made regarding their daughter's death. In the 911 call, Mr. Noll gave the dispatcher a questionable explanation for Ms. Noll's fall and his subsequent actions. After Attorney Sallee conveyed her preliminary thoughts, the Claimants agreed to retain Attorney Sallee and wrote her a check for $5,000. In this meeting, the Claimants orally agreed to pay Attorney Sallee $250 per hour for her services.

At the time of the September 21 meeting, the Claimants and Attorney Sallee all realized that the statute of limitations for a wrongful death action would expire shortly, in mid-October 2010. Even though she had only an oral representation agreement, in light of the looming expiration of the limitations period, Attorney Sallee launched into intensive work on the case. Documentation later submitted by Attorney Sallee indicated that her initial work included tasks such as making several trips to the police station regarding the 911 tape, viewing multiple episodes of the *48 Hour* television show on similar cases, researching wound patterns and medical examiner statutes, researching strangulation and comparing strangulation with blunt trauma, driving to various locations to pick up medical records, and then upon arrival spending substantial time waiting for the medical records.

Attorney Sallee communicated developments in the case primarily by sending emails to Ms. Rodgers. Although Attorney Sallee and Ms. Rodgers exchanged many emails, none of Attorney Sallee's emails detailed her time spent working on the case. A few contained general information, largely in the context of demands for more money. For example, an email from Attorney Sallee to Ms. Rodgers dated October 9, 2010, claimed that Attorney Sallee had already worked "in excess of 60 hours" and had "set aside other cases because things had to be done." The October 9 email to Ms. Rodgers insisted that Attorney Sallee "need[ed] to be paid and we need to have an agreement before I can spend the next 48 hours straight without an agreement." In response, Ms. Rodgers told Ms. Sallee that she and Mr. Bible would be happy to sign a written representation agreement if Attorney Sallee would send them one to review. Ms. Rodgers also asked Attorney Sallee to let them know if she needed more money.

A few days later, on October 13, 2010, Attorney Sallee told the Claimants that, in order to continue representing them, she would need a $20,000 retainer. Despite the absence of a written representation agreement, Ms. Rodgers wrote Attorney Sallee a check for an additional $15,000. Thus, combined with the prior $5,000, within roughly three weeks after her initial engagement, Ms. Sallee received a total of $20,000 in fees. During this time, Attorney Sallee did not provide the Claimants with any sort of billing statement.

On October 15, 2010, Attorney Sallee filed a timely wrongful death complaint against Mr. Noll in the Circuit Court of Knox County, Tennessee. Attorney Sallee's agreement was to represent only the Claimants. Despite this, the complaint drafted by Attorney Sallee was filed on behalf of not only the Claimants, but also on behalf of Ms. Noll's children and the estate of Ms. Noll. The complaint did not plead the claim by the grandparents as "next friend" of the grandchildren.

On October 19, 2010, Attorney Sallee sent another email to Ms. Rodgers. This email emphasized to Ms. Rodgers that Attorney Sallee had "already put in in excess of 80 plus hours and spent @200 in expenses like for the 911 recording and x-rays and mil[e]age." That same day, Ms. Rodgers received a visit at her home from the friend who had initially recommended Attorney Sallee to the Claimants. The friend admonished Ms. Rodgers that the Claimants had not given Attorney Sallee enough money for her retainer. This prompted Ms. Rodgers to immediately write Attorney Sallee an additional check, in the amount of $10,000. The friend then delivered Ms. Rodgers' check to Attorney Sallee.

In the same time frame, Attorney Sallee advised the Claimants that, in addition to the pending wrongful death action against Mr. Noll, they should seek custody of their grandchildren. Ms. Rodgers was reluctant to do so. She agreed, however, to permit Attorney Sallee to file a dependency and neglect petition as to the grandchildren in the juvenile court,

on the Claimants' behalf.  They agreed on a flat fee for Attorney Sallee for the juvenile court action, in the amount of $4,000.

During this time period, in connection with the pending wrongful death action, an issue arose concerning the retention of a crime scene expert.  Attorney Sallee told the Claimants that a particular forensics expert, Rod Englert, was essential to their case, and asked the Claimants to write an additional $5,000 check to retain Mr. Englert as their expert witness.

In sum, then, within a month after the initial engagement, the Claimants provided Attorney Sallee with three separate checks: (1) a $10,000 check, as a further retainer (2) a $4,000 flat fee for the juvenile court proceeding, and (3) a $5,000 check to retain the forensics expert, Mr. Englert.  This was in addition to the $20,000 in fees they had already paid her.

Ms. Rodgers found that she felt uneasy about Attorney Sallee's advice to retain Mr. Englert as the Claimants' expert witness.  After doing online research on the topic, Ms. Rodgers found another expert, Dr. Cyril Wecht, whom she preferred.  Ms. Rodgers described Dr. Wecht as "world-renowned" in the field of forensics.  After Ms. Rodgers relayed to Attorney Sallee her research on Dr. Wecht, Attorney Sallee reluctantly drew up an engagement letter for Dr. Wecht and forwarded Ms. Rodgers' $5000 expert retainer check to him.

In addition to the wrongful death lawsuit and the juvenile court petition, Attorney Sallee filed a petition on the Claimants' behalf in the probate court, aimed at preventing Mr. Noll from liquidating the estate of Ms. Noll.  Attorney Sallee did not tell the Claimants in advance that she was going to file the probate court petition on their behalf.

In late November 2010, approximately two and a half months after their initial consultation, Attorney Sallee sent Ms. Rodgers an email exhorting her that the Claimants "needed to give her some more money, that she was out of money," and that she "needed at least another $20,000." Ms. Rodgers complied with this demand by sending Attorney Sallee a check in the amount of $20,000. According to documentation later submitted by Attorney Sallee,[2] after she received Ms. Rodgers' $20,000 check, Attorney Sallee worked

_____

[2] References in this Opinion to documentation on time worked by Attorney Sallee refer to documents purported to be "billing statements" that Attorney Sallee provided to the Tennessee Board of Professional Responsibility in response to the complaint. As discussed below, however, although Attorney Sallee refers to these documents as "billing statements," she never provided the Claimants with an accounting or itemized billing statement or accounting of her time spent working on their matters, outside of the context of the Board

approximately 11.5 more hours.

Finally, in early December 2010, the Claimants asked Attorney Sallee for a written contract addressing her representation of them. In response, Attorney Sallee gave the Claimants several confusing draft agreements that included "a conglomeration of hourly charges, plus contingency [fees]." The inclusion of contingency fees in the draft agreements came as a surprise to the Claimants; they had been under the impression that Attorney Sallee was to receive only hourly fees, not contingency fees. In view of this discrepancy, the Claimants declined to sign the proposed agreements. A torrent of emails between Attorney Sallee and Ms. Rodgers ensued.

On December 10, 2010, almost three months after their initial meeting, Attorney Sallee sent an email to Ms. Rodgers that included complaints about her compensation. Unlike her many preceding emails, Attorney Sallee's December 10 email included a precise total for Attorney Sallee's time entries to date; Attorney Sallee claimed that she had put in "[o]ver 528.1 hours so far . . . [a]nd that is not comprehensive and does not include fees for time in phone calls or e-mails or time and a half for necessary work after six." Attorney Sallee bluntly criticized Ms. Rodgers as a client and insisted on a fee contract that included contingency fees:

> So the total value of just my time not including calls and emails is in excess of [$]132,000. I was content to just go along and just get what was convenient for you, so is this better? This case, cases is, are [sic] worth more than that to me IF you let me run it and win. Your back seat driving will destroy it. I will be forced to withdraw if I don't get Englert and whatever experts I need. I am willing to work something out agreeable to us all but I will not brook [sic] anymore second guessing. . . . The cases need what they need Fran and you don't know anything about it. . . . To protect me and my interests, we need to sign a contract covering all cases and insurance funds and contingency fees next week. We need to come to a clear understanding. . . . I will send you a proposal and you can agree to find someone else, but I will have the right to file against any funds recovered in the future by any other lawyer. . . . You are not the lawyer, I am. You don't know enough to know what I need. I do.

Despite Attorney Sallee's jeremiad, the Claimants continued to refuse to sign the fee agreements she proposed.

In an apparent attempt to pressure the Claimants into executing her proposed fee

---

proceedings.

-5-

agreement, in early January 2011, Attorney Sallee threatened to "drop [the Claimants] from the case." Finally fed up, the Claimants instead "decided it was time to drop her." The Claimants sent Attorney Sallee a formal letter terminating her representation of them in all matters.

Attorney Sallee did not take the termination well. She first accused the Claimants of conspiring behind her back. When the Claimants requested their file, Attorney Sallee refused to provide them the entire file. As justification, Attorney Sallee asserted that the Claimants owed her "eighty-plus thousand dollars, in addition to what [they had] already paid her." She mailed the Claimants a letter to this effect on January 5, 2011.

In mid-January 2011, Mr. Bible and Ms. Rodgers each sent a complaint letter to the Tennessee Board of Professional Responsibility ("BPR" or "the Board"), outlining some of the difficulties with Attorney Sallee's representation of them. The letters to the BPR protested Attorney Sallee's refusal to turn over files, medical records and other items, questioned Attorney Sallee's mental health status[3] in light of her behavior, and noted that Attorney Sallee had never given them an itemized billing statement, despite her numerous assertions regarding the amount of time she had spent working on their legal matters.

In early February 2011, Attorney Sallee sent the BPR her initial response to the Claimants' complaints: a 21-page letter, single-spaced. Although she had never given the Claimants an itemization of her time spent on their cases, Attorney Sallee attached to her BPR response an itemized "billing statement" with detailed time entries on the work she claimed to have done for the Claimants.[4]

Despite the Claimants' complaint to the BPR, Attorney Sallee continued to refuse to turn over to the Claimants items from their files. This forced the Claimants to hire another

---

[3]Attorney Sallee's mental health was not at issue before the Panel, and it made no findings on this assertion. Therefore, we do not address the Claimants' allegations of such.

[4] The "billing statement" submitted to the BPR included handwritten notes at the bottom of each page. The handwritten notes appear to refer to time entries billed at $375 per hour, well in excess of the $250 per hour rate discussed with the Claimants. The record is not entirely clear on the reason for the rate increase, but seems to indicate that it is for hours worked outside of normal business hours. The "billing statement" has time entries for the time period of September 16, 2010 (the date of the initial meeting) to December 3, 2010, totaling 493.5 hours. Of this total, 135 hours were shown at a rate of $375 per hour, and the remaining 358.5 hours were shown at the agreed rate of $250 per hour. According to Attorney Sallee's "billing statement," in a time span of less than three months, the accrued hourly charges on the Claimants' legal matters came to over $140,000. Subtracting the $54,000 the Claimants had already paid, Attorney Sallee maintained that the Claimants still owed her over $86,000. The "billing statement" provided to the BPR did not include the contingency fees Attorney Sallee sought in addition to the hourly charges.

attorney, Larry Vaughan, to obtain the withheld items. To that end, in early March 2011, Attorney Vaughan filed an action on behalf of the Claimants against Attorney Sallee in the Knox County Chancery Court. The lawsuit specifically sought medical records on Ms. Noll that Attorney Sallee had retrieved from the hospital, as well as brain tissue slides from Ms. Noll's autopsy that were in Attorney Sallee's possession.

The filing of the chancery court complaint did not persuade Attorney Sallee to turn over the disputed items to the Claimants. Instead, on March 4, 2011, Attorney Sallee sent Attorney Vaughan an email threatening legal action against the Claimants if they did not drop the lawsuit:

> Dear Mr. Vaughan: I am in receipt of your complaint drafted on behalf of Fran Rodgers (Mr. Bible was not my client). I suggest an immediate meeting between you and I at your earliest convenience. The crucial facts pled in your complaint are grossly incorrect or deliberate misrepresentations or outright fraud by your client. Further, there are issues that you have apparently unfairly been deliberately kept ignorant of. I am confident that you will agree to immediately withdraw that complaint after I share the overwhelming proof on the facts in this matter. If not, of course, I will be filing a cross complaint against your clients for theft of services and other unsavory torts committed by them against my firm. . . . Sincerely, Yarboro Sallee

Attorney Vaughan apparently did not respond to this email, and his failure to respond displeased Attorney Sallee. Consequently, three days later, on March 7, 2011, Attorney Sallee sent Attorney Vaughan another email. This one threatened criminal charges:

> I am enclosing a letter to you that needs an immediate response from you. Please respond to my offer of meeting with you to show you the overwhelming proof that I have against your client. This investigation[]is required by Rule 11. If I do not hear from you today before end of business, you can respond by e-mail to ac[c]ept my offer of a meeting, I will be proceeding to charge your clients with felony violations of TCA 39-14-104 (1). Sincerely, Yarbi

Attorney Sallee's saber-rattling emails apparently did not have their intended effect; the chancery court lawsuit to obtain the Claimants' materials proceeded. In early April 2011, the chancellor ordered Attorney Sallee to turn over the remaining items to the Claimants.

In the meantime, the BPR began investigating the Claimants' complaints. In December 2011, the Board filed the instant petition for discipline against Attorney Sallee. The petition alleged violations of Tenn. Sup. Ct. R. 8, RPC 1.1 (competence), RPC 1.4

(communication), RPC 1.5 (fees), RPC 1.16(d) (protecting client's interests after discharge), RPC 4.4(a)(2) (threatening criminal or lawyer disciplinary charges), RPC 8.4(a) (misconduct by violation of RPC), and RPC 8.4(d) (misconduct by conduct prejudicial to administration of justice). A BPR hearing panel was appointed.

The filing of the BPR petition was followed by a plethora of pre-trial motions and disputes. After these were resolved, on August 14 and 15, 2012, the panel conducted its final hearing. The hearing panel heard testimony from Ms. Rodgers as well as several expert witnesses. Attorney Sallee was represented by counsel at the final hearing, but she did not attend it.[5]

In light of Attorney Sallee's absence from the final hearing, her June 2012 deposition was admitted into evidence. In her deposition testimony, Attorney Sallee said that, during the time she was representing the Claimants, she was also representing 28 to 30 other clients in ongoing matters. She asserted that she refrained from pursuing new business while she was representing the Claimants. Attorney Sallee conceded that, when she filed the Claimants' wrongful death lawsuit, she had never successfully prosecuted a wrongful death claim to resolution. She maintained that, in her first meeting with the Claimants, she gave them a copy of a proposed fee contract. However, she acknowledged that the Claimants never executed that proposed fee contract or any other written fee agreement.

In her testimony, Attorney Sallee addressed the number of hours she worked on the Claimants' wrongful death case: "[I]t was in excess of 40 [hours per week] . . . at several points, as well as weekends." She said that she used email to update the Claimants on the work she was doing and the number of hours she had worked. Regarding the "billing statement" submitted to the BPR in response to the complaint, Attorney Sallee purportedly could not recall when the document was created, but she claimed that she "added to it at some point as I went along." Asked if her preparation of the "billing statement" was contemporaneous with the provision of legal services, Attorney Sallee gave this response: "I kept notes, and I – obviously didn't type it up like this, but I kept notes, yes. But my concern was getting the work done."

In the deposition, Attorney Sallee was questioned at length about a number of the entries on the itemized "billing statement." She acknowledged errors in the entries but claimed that all of the errors were inadvertent, the result of her focus on "getting the work done."

---

[5] Attorney Sallee claimed that she did not attend her disciplinary hearing because a juvenile court judge "threatened her with arrest if she did not attend" a hearing on an unrelated matter.

For example, BPR counsel questioned Attorney Sallee about time entries on the "billing statement" that indicated that, on some days, she had worked anywhere from 19 hours to 23 hours in a single day.[6] Attorney Sallee insisted that she had in fact worked the number of hours reflected on the statement:

[W]hen I did these columns, some of them have – are not exactly lined up where they should be. But did I work many, many hours a day devoted to this case? Yes, I did. And the activities here were all performed. Now, where they were exactly on what day, I'm – I think that the columns are a little off.

Asked if she slept on days when she claimed to have worked 19 to 23 hours, Attorney Sallee responded, "Yes, I did, but not that much. And as I said, it appears to me that what's happened is these columns are not lined up completely correctly. All the work was performed that's listed."

BPR counsel also asked Attorney Sallee about time entries on the "billing statement" on her retrieval and review of 911 records. Specifically, Attorney Sallee was asked why she did not consolidate four different time entries on her review of the 911 records. She did not directly answer the question, but instead said that the time entries were for time transcribing the 911 tape, as well as time spent doing "various research on that and – on the Internet as well as books and materials like that." BPR counsel also questioned Attorney Sallee's choice to personally make the many trips to the police office and to various hospitals to retrieve records–charged at a lawyer's rate–instead of employing a courier or an assistant to do so. Attorney Sallee responded that she could not hire a non-lawyer to perform these tasks because police officials and hospital representatives did not want to give her the information she sought, and "the case . . . had gotten so convoluted and at such a late date that the only person that could do it [pick up records] would have been an attorney."

In her deposition testimony, Attorney Sallee maintained that it was not inappropriate for her to charge the Claimants for the considerable time she spent educating herself about pathology and autopsy protocols, instead of enlisting the aid of an expert.[7] At the time, she said, she was planning to take the deposition of an expert, but nevertheless believed that the hours she charged the Claimants were "all necessary. Did I try to – to find out as much as

---

[6] According the purported "billing statement," Attorney Sallee billed 20.5 hours on September 28; 23 hours on October 1; 21.9 hours on October 6; 19 hours on October 10 and 20 hours on November 3.

[7] The "billing statement" appears to indicate that Attorney Sallee spent over 53 hours familiarizing herself with autopsy protocols and the field of pathology. At her "regular" rate of $250 per hour, this would have totaled $13,250.

I could about the subject matter to achieve my clients' goals? Yes, I did."

At the time of her deposition, Attorney Sallee claimed that the Claimants owed her "eighty-some thousand" dollars, over and above the $54,000 they had already paid.[8] Before the Claimants filed their complaint with the BPR, Attorney Sallee filed an attorney fee lien for these fees against the proceeds from Lori Noll's life insurance policy that were purportedly at issue in the wrongful death case, as well as any other recovery the Claimants might receive.[9] Explaining her claim for both hourly fees and contingency fees, Attorney Sallee referred to "an either/or situation" but added, "Since I was out of the case, it was hourly."

BPR counsel also questioned Attorney Sallee about the items from the Claimants' file that she withheld after the Claimants terminated her representation. Attorney Sallee said that, within two days after she received Ms. Rodgers' January 3, 2011 letter terminating her representation, she "turned everything that I had not personally paid for over to" the Claimants via FedEx certified mail. She claimed that she sent the Claimants "a 200-page document that was bound that had all the information in it that I had collected from the detective and various sources that I had provided to [forensics expert] Cyril Wecht . . . , as well as the other material that [she] had." Attorney Sallee acknowledged that she withheld some items from the Claimants: "I withheld after reviewing what I thought I could withhold, which was what I paid for . . . and what I contracted for, which was Cyril Wecht. The contract was between . . . he [sic] and my office, although the clients had paid for his services." She did not dispute that she withheld brain tissue slides from Lori Noll's autopsy.

In her testimony, Attorney Sallee was asked about her March 4, 2011 email to the Claimants' new attorney, Attorney Vaughan, threatening legal action against the Claimants unless they dismissed the lawsuit to obtain the withheld items. Attorney Sallee claimed that the email was sent inadvertently: "It was not intended to be sent. . . . It was a draft that I had been working on and inadvertently sent." She offered this explanation:

---

[8]Attorney Sallee asserted that she worked many hours that were not reflected on the "billing statement" provided to the BPR. She claimed that, between December 3, 2010 and January 3, 2011, she worked some 68 hours that were not included in the itemized "billing statement." In addition, she claimed she did not include in the "billing statement" hours spent on multiple calls and e-mails to the client, filing fees, process servers, secretary/paralegal fees, and other fees. Attorney Sallee said that she did not include these additional hours worked in the total amount she contended the Claimants owed her.

[9]The attorney fee lien was filed against the proceeds from Lori Noll's life insurance policy even though the Claimants were not named beneficiaries on the policy; reportedly, the named beneficiaries were Mr. Noll and/or the children of Lori Noll.

I had bought – recently gotten a touchscreen iPad and iPhone.  And from the iPhone, it has a – a send when you're working on something, and apparently I hit it.  I didn't realize it had been sent until I received the petition.  It was not ever intended to be sent.  It was a work in progress.   I don't know if I would have sent it.  But it certainly wasn't intended to be sent.

Not surprisingly, after hearing this response, BPR counsel asked Attorney Sallee about the email she sent to Attorney Vaughan a few days later, on March 7, 2011, threatening to file criminal charges against the Claimants if they refused to drop the lawsuit.  She claimed that this threat was unintentional as well: "I didn't intend to have that last line in there, but – because the first one, as you can see doesn't say that.  It's more circumspect."  When pressed, however, Attorney Sallee admitted that she did in fact send both threatening e-mails to Attorney Vaughan.

The hearing panel also heard testimony from Ms. Rodgers.  She described the initial meeting with Attorney Sallee as "just chitchat, mostly" and said that, at the time, she knew little about Attorney Sallee's professional reputation.  Ms. Rodgers said that this first meeting "wasn't really a consultation" and "money was not discussed whatsoever."

In the second meeting on September 21, 2010, Ms. Rodgers said, Attorney Sallee played the 911 tape for the Claimants and told them that they might have a case.  She indicated to the Claimants that she "had done some criminal work."  Pleased with that information and with Attorney Sallee's initial investigation, Ms. Rodgers said that she and Mr. Bible entered into an oral agreement to have Ms. Sallee represent them for $250 per hour.   Ms. Rodgers recounted that they were led to believe that this hourly rate was discounted; Attorney Sallee told them that her normal rate was $500 per hour, so by charging them only $250 per hour, she was "doing us a favor."  In response to Ms. Rodgers' inquiry, Attorney Sallee estimated that the contemplated wrongful death action would cost the Claimants no more than $100,000.[10]

Ms. Rodgers reviewed the claims Attorney Sallee made in her emails to Ms. Rodgers about the time she had worked on their behalf and compared those claims with the itemized "billing statement" Attorney Sallee sent the BPR.  In her testimony, Ms. Rodgers observed

---

[10] In Ms. Rodgers' complaint letter to the BPR, she said that she questioned Attorney Sallee about the maximum amount that a wrongful death lawsuit would cost the Claimants, asking: "[A]re we talking $100,000, $120,000, $150,000?" Ms. Rodgers said that Attorney Sallee responded, "no not that much." Ms. Rodgers' BPR complaint letter also said that Ms. Rodgers cautioned Attorney Sallee that the Claimants "could only afford to commit a maximum of $150,000 total cost to the case and she indicated we could do it for that." (emphasis in original).

that the hours listed in the "billing statement" were "a lot more" than those referenced in Attorney Sallee's emails. Since Attorney Sallee had never sent the Claimants an itemized billing statement, they were unaware that Attorney Sallee was charging them $375 per hour for so-called "after hours" work. Ms. Rodgers said she gave Attorney Sallee four checks totaling $54,000 for her legal services and an additional $5,000 check to retain the forensics expert.

Ms. Rodgers also testified about the termination of Attorney Sallee's representation. After Ms. Rodgers and Mr. Bible "begged and begged and begged her to give us a written contract," Attorney Sallee finally gave them a proposed fee contract. To Ms. Rodgers' surprise, in addition to hourly fees, the proposed contract included a provision for a contingency fee. Ms. Rodgers said that the proposed fee contract "absolutely made no sense at all. There were portions of some old document out of Anderson County that was in with what she sent us." Unable to "make heads or tails out of" the proposed contract, Ms. Rodgers sent Attorney Sallee an email asking to discuss the agreement in person. Instead of agreeing to meet with Ms. Rodgers, Attorney Sallee sent her revised proposals. All of them included a 40% contingency fee on the proceeds of the life insurance policy on Ms. Noll, even though neither of the Claimants were named in the policy as beneficiaries. Ms. Rodgers testified that she declined to sign any of Attorney Sallee's proposed contracts because "none of them . . . made enough sense that I would have felt comfortable enough signing."

After the Claimants finally terminated Attorney Sallee's representation, Ms. Rodgers testified, Attorney Sallee sent her a package with "a few sheets of paper in it but nothing really that was not something I didn't already have a copy of." She said that Attorney Sallee refused to turn over the remainder of their file, including Lori Noll's medical records and the brain tissue slides from the autopsy. Ms. Rodgers was then forced to hire another attorney to file a lawsuit to compel Attorney Sallee to turn over the withheld items, which cost the Claimants "another ten grand."[11] Ms. Rodgers claimed that Attorney Sallee also prevented their new attorney from communicating with the forensics expert, Dr. Wecht, so they had to ask the chancery court to enter an order "to free Dr. Wecht up so we could communicate with him." Attorney Sallee's actions, Ms. Rodgers estimated, interrupted the wrongful death proceedings for two to three months.

BPR counsel asked Ms. Rodgers about the lawsuit Attorney Sallee filed in the juvenile court on the Claimants' behalf. Ms. Rodgers described Attorney Sallee as "insistent that we try to get custody of my grandchildren" by filing the action in juvenile court. Ms. Rodgers

_____

[11] The Claimants' new attorney, Attorney Vaughan, did not testify at the disciplinary hearing. However, he sent the BPR a letter in which he confirmed that he received Attorney Sallee's March 4, 2011 and March 7, 2011 emails, threatening legal action and criminal charges.

acquiesced but never became comfortable with Attorney Sallee's recommendation. The Claimants later dismissed the request for custody and instead pursued grandparent visitation. Ms. Rodgers also said that Attorney Sallee filed the probate proceeding, supposedly to prevent Lori Noll's husband from liquidating their daughter's estate, without discussing it with the Claimants in advance. This concluded the testimony submitted to the hearing panel.

On August 30, 2012, the hearing panel issued a twelve-page decision. It held:

2. The Respondent violated Rule 1.4, Communication, in that Respondent failed to keep her clients reasonably informed of the amount of fees and expenses that were accruing in regards to the representation and because the Respondent did not keep her clients reasonably informed as to the services she intended to perform in the Probate proceeding or what efforts she made on behalf of her clients in regard to the life insurance issue.

3. The Respondent violated Rule 1.5, Fees, in that Respondent's fee was not reasonable considering the amount involved and the results obtained; the nature and length of the professional relationship with the clients; the statements that the Respondent made to the clients regarding the fees she usually charged and the expectations she set with the clients as to total fees to be charged in the matter; because the Respondent sought a contingent fee on top of the amounts already paid by hourly billing; and because the fee agreement between the Respondent and her clients was not in writing.

4. The Respondent violated Rule 1.16, Declining and Terminating Representation in that Respondent failed to promptly surrender papers and property of the client and work product relating to the Wrongful Death Suit which were necessary to prevent a materially adverse effect on the clients with regard to the ongoing Wrongful Death Suit and ultimately, required Ms. Rodgers and Mr. Bible to file a separate civil action against the Respondent and obtain a court order before the Respondent would turn over all appropriate and necessary materials relating to the Wrongful Death Suit to her former clients.

5. The Respondent violated Rule 4.4, Respect for the Rights of Third Persons in that the Respondent threatened to present criminal charges against her former clients in order to obtain an advantage in the dispute with them with regard to fees the Respondent claimed to be owed and client file materials which the Respondent refused to turn over.

-13-

6. The Respondent violated Rule 8.4, Misconduct, in that she violated the Rules of Professional Conduct and engaged in a course of misconduct that was prejudicial to the administration of justice.

Thus, the hearing panel determined that Attorney Sallee violated Rules 1.4, 1.5, 1.16, 4.4, and 8.4 of Tennessee's Rules of Professional Conduct. The hearing panel also found several aggravating factors: a pattern of misconduct, multiple violations, a "dishonest and selfish motive," refusal to acknowledge that the conduct was wrongful, and indifference to making restitution. The only mitigating factor was the absence of any prior discipline. Emphasizing the multiple violations, the hearing panel entered a judgment suspending Attorney Sallee from the practice of law for one year, subject to reinstatement upon proof of rehabilitation.[12]

Attorney Sallee did not accept the decision of the hearing panel. She hired a new attorney,[13] and, on October 29, 2012, she filed a petition for a writ of certiorari in the Chancery Court of Knox County, Tennessee, seeking judicial review.

In the petition, Attorney Sallee argued that the hearing panel's decision violated constitutional and statutory provisions, was made upon unlawful procedures, was arbitrary and capricious, and was unsupported by substantial and material evidence. She also claimed that the hearing panel had exceeded its jurisdiction. She asserted that various procedural irregularities deprived her of her "right to an impartial, fairly selected hearing panel and competent counsel."

The trial court granted the writ, thus requiring the BPR to forward to the trial court its record. The trial court then scheduled the trial on the petition. After discovery disputes arose, the trial court postponed the trial. Months later, the trial was rescheduled for May 5, 2014.

In the meantime, the proceedings on the Claimants' cases continued. Ultimately, all were either settled or dismissed. In the wrongful death case, half of the million dollar life insurance policy was awarded to Mr. Noll, and the other half was placed in trust for Ms.

---

[12] The Panel's order did not expressly reference the ABA standards for Imposing Lawyer Sanctions. However, at the hearing, counsel for the parties repeatedly referenced the standards in their oral arguments before the Panel.

[13] Throughout the disciplinary proceedings, Attorney Sallee was represented by F. Chris Cawood. After the hearing panel issued its decision, Mr. Cawood withdrew from representing her. She retained two more attorneys, who later also withdrew. Subsequently, Attorney Sallee retained attorneys Cynthia A. Cheatham and William W. Hunt, who filed the petition for a writ of certiorari in the Knox County Chancery Court.

Noll's children and for housing.

In April 2014, a few weeks before the scheduled trial, Attorney Sallee filed a motion asking the trial court to consider post-judgment facts, or to remand the case to the hearing panel for them to reconsider the allegations against her in light of the resolution of the cases in which Attorney Sallee had represented the Claimants. She argued that the work she performed for the Claimants had contributed to the resolution and justified the amount of fees she sought from the Claimants. The Board responded in opposition to Attorney Sallee's motion, arguing that the records in the Claimants' cases showed there was no justification for Attorney Sallee to charge the Claimants over $140,000 for two and one-half months of work.[14]

The trial judge, the Honorable Don R. Ash, held the trial as scheduled, on May 5, 2014. At the outset, the trial court denied Attorney Sallee's motion.[15] It permitted no additional proof at the trial, and so considered only the record before the hearing panel.

The trial court, however, permitted counsel for each party to present oral argument. Counsel for Attorney Sallee challenged the jurisdiction of the hearing panel to adjudicate what she characterized as a fee dispute, argued that there was no material and substantive evidence to support the hearing panel's findings, asserted that the hearing panel applied an outdated version of the rules, and contended that the discipline imposed was excessive.

The trial court entered an order a few days later, on May 9, 2014. The trial court recounted the findings of the hearing panel and issued its own independent conclusions based on the record.

The trial court disagreed with Attorney Sallee's characterization of the matter as a fee dispute and rejected her related challenge to the jurisdiction of the hearing panel. It upheld the panel's decision that Attorney Sallee had violated Rule 1.4 by failing to keep her clients reasonably informed, and that she violated Rule 1.5 by charging them an unreasonable fee. It determined that these findings were supported by material and substantial evidence in the record.

---

[14] By way of comparison, the Board noted in its response that the attorney fee charged by the guardian ad litem for work performed over a two-year period, for the juvenile court case and the probate court case combined, totaled just over $40,000.

[15] Initially, the trial court allowed Attorney Sallee to make an offer of proof regarding ultimate resolution of the cases in which she had represented the Claimants. It later disallowed the documents offered by Attorney Sallee, citing Tennessee Supreme Court Rule 9 § 33.1(b), because the documents were irrelevant to the proceeding. On this basis, the trial court denied Attorney Sallee's motion.

The trial court also found material and substantial evidence to support the hearing panel's holding that Attorney Sallee violated Rule 1.16 by failing to promptly surrender to the Claimants items from their file after their termination of her representation. The trial court acknowledged that the parties disagreed over how many items were withheld, but noted that Attorney Sallee admitted that she withheld some items until the chancery court ordered her to turn them over to the Claimants.

The trial court rejected Attorney Sallee's argument that she did not intend to send to Attorney Vaughan the emails threatening criminal charges, and her argument that the evidence on the emails was not authenticated. It noted that Attorney Sallee admitted in her testimony that she in fact sent the emails. Consequently, it upheld the hearing panel's holding that Attorney Sallee violated Rule 4.4 by threatening criminal prosecution.

The trial court also rejected Attorney Sallee's argument that the hearing panel utilized an outdated version of the Rules of Professional Conduct because some of the conduct underlying the violations occurred after the January 1, 2011 adoption of new version of the Rules. The trial court held that Attorney Sallee did not raise this argument to the hearing panel and did not show any prejudice or harm caused by any difference between the Rules in effect before January 1, 2011, and the Rules in effect after that date.

The trial court then addressed Attorney Sallee's contention that the discipline imposed was excessive. It described the ABA standards as "'the guideposts hearing panels and courts in Tennessee use when determining appropriate, consistent sanctions for attorney misconduct.'" In light of these standards, it held that the hearing panel did not act in an arbitrary or capricious manner. It also held that the hearing panel's decision was neither unreasonable nor an abuse of discretion. Therefore, the trial court affirmed the decision of the hearing panel.

After the trial court entered its order affirming the hearing panel's decision, counsel for Attorney Sallee filed a notice that they would not be representing Attorney Sallee "in further proceedings in the Supreme Court, should [there be] any such proceedings."

Representing herself, Attorney Sallee filed a timely notice of appeal. Three days later, Attorney Sallee filed a "Motion for New Trial or to Amend the Judgment of the Trial Court or in the Alternative for the Recusal of Judge Ash and the Appointment of a New Judge to Hear this Matter."[16] The motion also asked the trial court to stay its order pending her

_____

[16] Rule 4(e) of the Tennessee Rules of Appellate Procedure provides: "If a motion specified in either subdivision (b) or (c) [motion to alter or amend/motion for a new trial] is filed within the time permitted by

appeal. In her motion, Attorney Sallee recited statements made by the trial judge at the trial. She claimed that these statements indicated that the trial judge did not review the entire hearing panel record before he issued his decision.[17]  She contended that the trial judge's statements at trial indicated that he did not receive the entire hearing panel record before the trial, so he asked counsel for Attorney Sallee to produce the record within 30 days. Despite the fact that she stated during the trial that the transcript had already been filed, she contended the hearing panel record was filed with the trial court on May 14, 2014, five days after the trial judge entered his May 9, 2014 order, affirming the decision of the hearing panel.  Based on this, Attorney Sallee argued that the trial judge failed to diligently, competently, and impartially perform his judicial duties.  She asked that the matter be remanded to a different trial judge.  The remainder of her motion reargued the merits of the case.[18]

---

the applicable rule referred to in that subdivision, the filing of a notice of appeal prior to the filing of the motion . . . does not deprive the trial court of jurisdiction to rule upon the motion." Tenn. R. App. P. 4(e). Thus, even though the motion was filed after Attorney Sallee filed her notice of appeal, the trial court had jurisdiction to adjudicate it.

[17]  The referenced exchange at the conclusion of the trial was as follows:
The Court: Counsel, educate me a little bit here. I think it's the responsibility of Ms. Sallee to file with the court in Knoxville the transcript from the hearing? Have you –
Attorney Sallee: Yes, sir.
The Court: Has that already been done?
[Counsel for Sallee]: Well, the  – yes, the transcript of the disciplinary –
The Court: Right.
[Counsel for Sallee]: Yes, that was done.
The Court: That's already been filed?
[Counsel for Sallee]: Yes.
The Court: In Knoxville?
[Counsel for Sallee]: Yes, your Honor.
The Court: Okay.  Good. So I'll file this, I'll do the order.  It's probably going to take me about 30 days.  I want to go back through these documents again.  So, if y'all give me 30 days to get that accomplished, I'd appreciate it.

[18]  In her motion, Attorney Sallee also objected to the trial court's comment that she "watched TV and charged her client for it."  She characterized this statement as "ridiculous," adding, "since when is television not a respectable avenue for research anyway."   Attorney Sallee pointed to a particular time entry on her "billing statement" as legitimate billable time because it was spent watching a five-hour documentary on the Peterson "Stair Case Murder" in North Carolina.  Her motion did not address a 12.5-hour time entry on September 25, 2010, for watching "48 Hours" episodes on similar spousal homicides, a 4.0-hour time entry on October 19, 2010 for watching four "48 Hours" episodes on asphyxia, or a 3.5-hour time entry on October 20, 2010 for watching these same "48 Hours" episodes a second time. At Attorney Sallee's regular hourly rate, this would amount to over $5,000 for watching episodes of "48 Hours."

In its response to Attorney Sallee's motion, the BPR attached excerpts from the transcript of the proceedings that clarified that the trial judge had merely asked counsel whether the transcript of the proceeding before the hearing panel had been provided to the trial court. The trial transcript showed that both Attorney Sallee and her counsel responded to this inquiry in the affirmative, indicating to the trial judge that the transcript of the hearing panel proceedings had already been filed with the trial court.

On December 23, 2014, the trial court entered an order denying Attorney Sallee's motion. The order recounted the lengthy history of this matter before the trial court, referencing the trial court's records, which included 35 documents and 18 trial exhibits. The trial court found that Attorney Sallee's assertions regarding the trial court's alleged failure to review the hearing panel record were "simply in error." The trial court detailed its process:

> This office received a copy of the entire record before the Board in December of 2012. It is this Court's practice to create a notebook with all relevant documents. Both sides filed briefs with extensive citations to the record which this Court reviewed. It is also this Court's practice to start early in the process to develop a document which contains proposed findings of facts plus reciting the conclusions of law which are normally cited in these types of cases. This is merely a draft to assist the Court. Additions and deletions are made during the trial. The Court is sorry Ms. Sallee is offended by the speed in which the final order was submitted, but this is simply not a basis for new trial or a Motion to Alter or Amend. The motions filed in this regard are denied.

Thus, the trial court denied Attorney Sallee's request for a new trial, as well as her motion for recusal and her motion for a stay. After many additional filings, the parties now appear before this Court.

### Issues Presented and Standard of Review

Attorney Sallee presents eight issues for review:

(1) In the Chancery Court below, Judge Ash rendered his decision to affirm the Tennessee Board of Professional Responsibility's Panel decision without engaging in the comprehensive review of the entire record prior to the rendering of his decision as is required [pursuant to] Tennessee Supreme Court Rule 9, section 1.03. [sic] Does this omission require remand for appropriate review with a new judge assigned?

(2) Was it an error for Judge Ash to refuse to consider the post-judgment facts that the complainants had benefitted greatly from the sole work of [Ms. Sallee] and that the original panel hearing had been conducted at a time when the issues were not justiciable and were not ripe for adjudication[?]

(3) [Whether] the issue regarding Attorney Sallee charging an excessive fee is unsupported by the evidence which is both substantial and material in light of the entire record Tenn. Sup. Ct. R. section 1.3(5).

(4) [Whether] the discipline imposed by the panel was excessive and therefore arbitrary and capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion[?]

(5) [Whether] the finding that Ms. Sallee acted inappropriately in returning the files of the complainants is unsupported by the evidence which is both substantial and material in light of the entire record Tenn. Sup. Ct. R. 9 section 1.3(5), and even if proven does not warrant a one year suspension when compared with all other cases decided by the TBPR wherein the misconduct alleged was far more serious, such as criminal acts, with many more alleged victims and long histories of past discipline.

(6) At the time of the panel hearing, was the case ripe for adjudication or was it unripe for adjudication as the case handled by Attorney Sallee was not concluded and that, in fact, complainants received enormous lucrative and other valuable intangible benefits as a direct result of the work performed by Attorney Sallee.

(7) [Whether] the emails which the hearing panel found to be unethical were not adequately authenticated and there is no proof that they were received and therefore would not constitute a violation of the Rules of Professional Responsibility.

(8) [Whether] the petition for discipline is constitutionally and procedurally defective since it failed to allege any violations of Rules of Professional Conduct that were in effect on the date of the alleged violations?

The Supreme Court has the ultimate power and duty of ensuring adherence to professional responsibility standards. Doe v. Bd. of Prof'l Responsibility, 104 S.W.3d 465, 469-70 (Tenn. 2003). When the Court is called upon to review judgments in disciplinary

proceedings against lawyers, it does so in light of the Court's fundamental and inherent power to promulgate, administer, and enforce the rules governing the licensing and professional conduct of lawyers practicing in Tennessee. Rayburn v. Bd. of Prof'l Responsibility, 300 S.W.3d 654, 660 (Tenn. 2009). This Court is the final arbiter of the propriety of the professional conduct of all lawyers practicing in Tennessee. Flowers v. Bd. of Prof'l Responsibility, 314 S.W.3d 882, 891 (Tenn. 2010); Sneed v. Bd. of Prof'l Responsibility, 301 S.W.3d 603, 612 (Tenn. 2010).

Under the system established by this Court to fulfill its responsibility,[19] an attorney who is formally charged by the Tennessee Board of Professional Responsibility with disciplinary violations is entitled to an evidentiary hearing before a hearing panel of the Board. The hearing panel considers the evidence, determines whether a violation has occurred and, if so, decides the penalty for the violation. Maddux v. Bd. of Prof'l Responsibility, 409 S.W.3d 613, 621 (Tenn. 2013) (citing Bd. of Prof'l Responsibility v. Cowan, 388 S.W.3d 264, 267 (Tenn. 2012); Tenn. Sup. Ct. R. 9, § 8.1)).

If the attorney is dissatisfied with the hearing panel's decision, the attorney may appeal the decision to the circuit or chancery court. When a lawyer seeks judicial review of a hearing panel's decision, the trial court's "review shall be on the transcript of the evidence before the hearing panel and its findings and judgment." Tenn. Sup. Ct. R. 9, § 1.3. The trial court will not disturb the hearing panel's decision unless the rights of the attorney have been prejudiced because the hearing panel's findings, inferences, conclusions or decisions are:

> (1) in violation of constitutional or statutory provisions; (2) in excess of the panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Sup. Ct. R. 9, § 1.3 (2010) (currently Tenn. Sup. Ct. R. 9, § 33 (2014)); see also Maddux, 409 S.W.3d at 621-22 (citing Cowan, 388 S.W.3d at 267).

Either the lawyer or Board's disciplinary counsel may appeal the decision of the trial court to this Court. In that event, our review is based on the record of the proceedings before

---

[19] On August 30, 2013, this Court adopted revisions to Supreme Court Rule 9, which governs the discipline of attorneys. These revisions went into effect on January 1, 2014, and do not apply in this case. See Skouteris v. Bd. of Prof'l Responsibility, 430 S.W.3d 359, 361 n.1 (Tenn. 2014).

the trial court, which includes the transcript of evidence before the hearing panel. Id. This Court applies the same standard of review as that applied by the trial court. Id. Like the trial court, this Court reviews questions of law *de novo*. Cowan, 388 S.W.3d at 267. In determining whether substantial and material evidence supports the hearing panel's decision, the reviewing courts evaluate whether the evidence "furnishes a reasonably sound factual basis for the decision being reviewed." Sneed, 301 S.W.3d at 612 (quoting Threadgill v. Bd. of Prof'l Responsibility, 299 S.W.3d 792, 807 (Tenn. 2009), overruled on other grounds by Lockett v. Bd. of Prof'l Responsibility, 380 S.W.3d 19, 27-28 (Tenn. 2012)). The reviewing court "shall take into account whatever in the record fairly detracts from its weight, but . . . shall not substitute its judgment for that of the hearing panel as to the weight of the evidence on questions of fact." Tenn. Sup. Ct. R. 9, § 1.3 (2010).

## Analysis

Attorney Sallee has raised a number of issues on appeal. We take each in turn.

*Trial Court's Review of the Record*

In her first issue raised, Attorney Sallee argues that Judge Ash erred by affirming the Panel's decision "without engaging in the comprehensive review of the entire record . . . as is required [pursuant to] Tennessee Supreme Court Rule 9, section 1.3." She asserts that Judge Ash "never had [the record] in his possession before he rendered his decision" and that the case should be remanded for an appropriate review with a new judge assigned."

Though her argument on this issue is somewhat unclear, we gather that Attorney Sallee is referring to a transcript that allegedly was untimely filed with the trial court. The filing of this transcript was Attorney Sallee's responsibility. At the trial, counsel for Attorney Sallee represented to Judge Ash that the transcript had been filed; Attorney Sallee now alleges this was not accurate and that she sent the transcript on May 14, 2014.[20] She contends Judge Ash could not have diligently performed his judicial duties in the absence of the transcript, and so asks this Court to reverse the trial court's decision and remand the matter to another trial judge.

We have carefully reviewed the record on these allegations. Two separate orders by the trial court make it clear that the allegations have no merit. First, the trial court's May 9, 2014 order clearly states that the trial judge made his decision "after hearing the presentation

---

[20] Because Attorney Sallee was not present at the evidentiary hearing before the Panel, most of the items submitted in her defense were admitted as exhibits to her deposition. These exhibits were included in the record before the trial court, separate from the transcript.

and argument of counsel for the Board and Ms. Sallee and the record as a whole." This is thoroughly explained in the trial court's December 23, 2014 order adjudicating Attorney Sallee's post-judgment motion. That order makes it clear that the trial judge had the entire record in his possession since December 2012. It noted the 35 documents and 18 exhibits in the record, and detailed the trial court's extensive preparation process and review in this matter.

Moreover, our review of the transcript of the hearing shows that Judge Ash was well prepared and had a clear understanding of the evidence in the record.[21] This issue is without merit.

*Post-Judgment Facts*

On appeal, Attorney Sallee argues that the trial court erred in refusing to consider "post-judgment facts" that, according to Attorney Sallee, showed that the Claimants "benefitted greatly" from her work. In a related issue, she contends that, at the time of the evidentiary hearing before the Panel, the disciplinary action was not ripe for adjudication because the underlying litigation had not resolved and the result of her representation had not yet been determined. We will address these issues together.

In her April 28, 2014 motion asking the trial court to consider post-judgment facts, Attorney Sallee refers to the following alleged facts:

(9) On July 8, 2013, [Rodgers and Bible] reached a mediation agreement [with Mr. Noll] resolving [the custody matter];

(10) On August 22, 2013, (one year after Hearing Panel Judgment) [the] Knox County Chancery Court . . . entered an order "Approving Minors' Settlement Agreement and Order of Compromise and Dismissal" with respect to Ms. Noll's $1,000,000 insurance policy. The mediated agreement put $250,000 in trust for the two children, ordered Mr. Noll to purchase a home in the amount of $300,000 "for the use and benefit of Mr. Noll and his two minor children," and awarded Mr. Noll the remainder of the monies.

---

[21]"An appellant is responsible for preparing the record and providing to the appellate court a 'fair, accurate and complete account' of what transpired at the trial level." Jennings v. Sewell-Allen Piggly Wiggly, 173 S.W.3d 710, 713 (Tenn. 2005) (citing State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993)); see also Henderson v. Bd. of Prof'l Responsibility, 125 S.W.3d 405, 410-11 (Tenn. 2003). Had the entire record not been provided to the trial court, then Attorney Sallee's failure to perform her responsibility would have lead to the same result, namely, affirmance of the Panel's decision.

(11) On September 25, 2013, (over one year after Hearing Panel Judgment) the Knox County Circuit Court entered an "Order of Compromise and Dismissal" in [the wrongful death case] . . . .

(12) The probate matter of In Re: Estate of Lori Renee Noll was closed on December 20, 2013.

Attorney Sallee argues that these post-judgment facts demonstrate that her work, and "solely her work," was of direct benefit to the Claimants and to the Nolls' minor children. She contends: "[I]t is grossly unfair to punish [me] severely for damage that never occurred . . . ."

The trial court permitted Attorney Sallee to make an offer of proof regarding these post-judgment facts. Ultimately, it denied her motion. In making its decision, the trial court cited Tennessee Supreme Court Rule 9 § 33.1(b), which states that "if allegations of irregularities in the procedure before the hearing panel are made, the trial court is authorized to take such additional proof as may be necessary to resolve such allegations." After considering the offer of proof, the trial court concluded that Ms. Sallee's allegations were "no[t] allegations of irregularities of which the additional facts would be necessary to resolve." We agree with this assessment. In this case, the alleged violations do not necessarily involve the quality of Attorney Sallee's work. Rather, they involve her excessive billing, her billing practices, and her conduct after the Claimants terminated her representation.

Moreover, resolution of the litigation months or years later is hardly indicative of any "benefit" the Claimants may have received from Attorney Sallee's representation of them or of the quality of her legal work.[22] In response to the Claimants' initial inquiry, Attorney Sallee estimated that the *entire* wrongful death litigation would cost no more than $100,000. At the time she was terminated, Attorney Sallee had done only very preliminary work on the case; she had not deposed any witnesses and had conducted little or no discovery. Despite this, she had already taken over $54,000 from the Claimants and asserted that the Claimants owed her over $86,000 more plus contingency fees.[23] Overall, we find that the matter was

---

[22]For example, as noted above, the wrongful death complaint Attorney Sallee filed was inexplicably filed not only on behalf of the Claimants, but also on behalf of the Nolls' children and on behalf of the estate of Ms. Noll. Attorney Sallee represented only the Claimants and had no authority to file a complaint on behalf of the children or the estate. Any cause of action would have belonged to Ms. Nolls' children, but the complaint did not include a claim by the grandparents as "next friend" of the children.

[23]As noted by the Panel, by way of comparison, the guardian ad litem for the Noll children charged a little over $40,000 for two years' work and obtained a global settlement of all cases and the creation of

ripe for adjudication by the Panel and that the trial court did not err in declining to consider the alleged post-judgment facts.

*Excessive Billing*

As her third issue, Attorney Sallee contends that the record does not contain substantial and material evidence to support the Panel's finding that the fee she charged to the Claimants was excessive. She argues strenuously that her fee was "on average per hour less tha[n] the average hourly fee of attorney[s] in Knoxville" and that "the record is replete with hundreds of e-mails and proof of calls every day" demonstrating her constant communication with the Claimants.

At the time the alleged misconduct occurred, Rule 1.4 (b) of the Tennessee Rules of Professional Conduct provided: "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Tenn. Sup. Ct. R. 8, RPC 1.4(b) (2010). Likewise, Rule 1.5 of the Tennessee Rules of Professional Conduct at that time required that "[a] lawyer's fee and charges for expenses shall be reasonable" and mandated that "the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation." Tenn. Sup. Ct. R. 8, RPC 1.5(a) and (b) (2010). In determining whether an attorney fee is reasonable, courts examine the following factors:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) The fee customarily charged in the locality for similar legal services;

(4) The amount involved and the results obtained;

(5) The time limitations imposed by the client or by the circumstances;

(6) The nature and length of the professional relationship with the client;

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services;

---

separate trust funds for the benefit of the children.

(8) Whether the fee is fixed or contingent;

(9) Prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10) Whether the fee agreement is in writing.

Tenn. Sup. Ct. R. 8, RPC 1.5(a) (2010); Wright ex rel. Wright v. Wright, 337 S.W.3d 166, 176-77 (Tenn. 2011). The Panel's written decision demonstrates that it properly considered these factors in reaching its decision. The trial court's order shows that it also considered them. We consider them as well.

Initially, we confess a certain amount of skepticism about Attorney Sallee's claim that she in fact worked well over 493.5 hours on the Claimants' matters in a span of three months, while also continuing to service the 28 to 30 other clients she claimed she had during that time period.[24] Nevertheless, we assume, for purposes of this appeal, that she actually worked those hours. Attorney Sallee's arguments are considered in light of this assumption.

We note that Attorney Sallee represents herself in this appeal. Her arguments to this Court demonstrate that, despite having gone through an evidentiary proceeding before the BPR hearing panel, chancery court litigation to force her to turn over case-related items to her former clients, and judicial review before Judge Ash, she comprehends little of why she finds herself in this predicament. We will endeavor to explain.

The record indicates that Attorney Sallee initially represented to the Claimants that she had considerable experience relevant to their legal concerns. She told the Claimants that her legal qualifications were such that she normally commanded $500 per hour for her time but, in this instance, she was willing to give them a "discounted" rate of $250 per hour. She estimated that the contemplated wrongful death lawsuit would cost the Claimants no more than $100,000. A mere three months later, Attorney Sallee claims, she had amassed charges totaling over $140,000.[25] For this fee, in the wrongful death case, she had accomplished only

---

[24]Asked about time entries on the "billing statement" indicating that she worked up to 19 or even 23 hours in a single day, Attorney Sallee insisted that she actually worked those hours, but added vaguely that certain columns on the so-called "billing statement" may not have lined up correctly.

[25]This total comes from the so-called "billing statement" that Attorney Sallee gave to the BPR. The entries on the document are confusing and disorganized, with time spent on each of the Claimants' matters combined. The entries are generally billed at a minimum increment of 0.5 hours. While the document has been referred to in these proceedings as a "billing statement," it is in fact no such thing, since it was never

the filing of a basic wrongful death complaint — which was pled incorrectly — and the gathering of the recording of the 911 call and a few pertinent documents and medical records. She had taken no witness statements, prepared no expert statements, taken no depositions, propounded no discovery requests. She had, however, engaged in a prodigious amount of wheel-spinning, spending countless hours, charged at a lawyer rate, in activities such as watching *48 Hours* television episodes, waiting in hospitals for medical records, and doing internet research on strangulation. Her communications with the Claimants referred to the hours she had worked only in general terms, and only in the context of badgering them for more money. At no point did she tell them that her original estimate had quickly proven unrealistic, that she was charging them a "time-and-a-half" $375 per hour rate for tasks performed after business hours, or that she intended to charge them lawyer rates for administrative tasks and watching television. At no point did she give them an itemized statement of her charges. As the final straw, toward the end of the three-month period, she insisted that the Claimants sign a representation agreement that would entitle her to charge contingency fees in addition to the high hourly rates she was already charging them.

The Rules governing lawyers require transparency and candor with clients. Many a lawyer has been asked by a prospective client to estimate how much a contemplated legal matter will cost. If the lawyer has sufficient experience, such an estimate can be given. However, under most circumstances, once it becomes reasonably clear to the lawyer that the estimate is inaccurate, this fact should be communicated to the client, so the client can make an informed decision about going forward with the case. See generally Tenn. Sup. Ct. R. 8, RPC 1.4 cmt. 1 (2010) ("Reasonable communication between the lawyer and the client is necessary for the client to effectively participate in the representation."). In this case, if Attorney Sallee's "billing statement" is to be believed, her fees reached the $100,000 level of her original estimate for the entire wrongful death litigation only two months after her engagement, at a time when the litigation was just getting started. Yet, she said nothing to the Claimants about the inaccuracy of her estimate. Thus, the Panel did not err in considering the fact that Attorney Sallee did not tell the Claimants that her original estimate of $100,000 for the entire wrongful death action had proven inaccurate.

Clients who are being charged hourly rates should be kept reasonably informed about the amount of work being done by the lawyer, the type of work being done, and the rates being charged for the hours worked. See generally Tenn. Sup. Ct. R. 8, RPC 1.5 cmts 1-5 (2010). Here, the Claimants had no way to know the enormous number of total hours Attorney Sallee was claiming to have worked. They were not told that Attorney Sallee sought to change the oral representation agreement to charge them "time and a half" for time

---

given to the Claimants until they filed complaints with the Board. We consider it instead to be an exhibit created by Attorney Sallee for the purpose of defending the BPR complaint.

spent working after regular business hours, or that she intended to charge them contingency fees in addition to hourly fees. They were not told that she intended to charge them lawyer rates, either $250 per hour or $375 per hour depending on the time of day, for tasks such as sitting at a hospital to wait for medical records. They were also not told in advance that Attorney Sallee was going to file a petition in probate court on their behalf. The Panel did not err in considering these facts in its decision.

Assuming *arguendo* that the hourly rate of $250 per hour is reasonable for Attorney Sallee's experience and ability,[26] it is important under the Rules that the lawyer ensure that the work for which he or she seeks to charge the client is "reasonable." For example, a lawyer who represents criminal clients may be interested in watching *Perry Mason* or *Breaking Bad* on television, and may even pick up a useful tidbit or two from doing so. The lawyer may not, however, equate that to research for which he or she may charge a client. In this case, the Panel did not err in considering the many hours Attorney Sallee sought to charge the Claimants for watching television shows such as *48 Hours*. In addition, the Panel considered the explanations offered by Attorney Sallee for charging the Claimants a lawyer's rate for many, many hours spent on essentially administrative tasks, and it found that she did not have adequate justification under the facts of this case for such charges. The Panel did not err in considering either of these factors in reaching the conclusion that Attorney Sallee sought to charge the Claimants for work that was not reasonable. RPC 1.5 cmt. 5 (2010) ("A lawyer should not exploit a fee arrangement based primarily on hourly charges by using wasteful procedures.").

In assessing the reasonableness of the charges, the lawyer must also take into account the "results obtained." At the time her representation of the Claimants was terminated, the legal matters for which Attorney Sallee was hired were far from resolved, so the ultimate result was not yet known. However, as outlined above, after three months' work, she had achieved little more than filing the wrongful death complaint and gathering obvious documents and records. Attorney Sallee was obliged to recognize that the $140,000 she sought to charge the Claimants at that juncture was outlandish in light of how little had been accomplished, and reduce her fee to a level commensurate with the very modest results she had obtained for the Claimants at that point. The Panel did not err in concluding that the fee Attorney Sallee sought to charge the Claimants was not reasonable in light of the minimal results accomplished for the Claimants at the time of the termination.

---

[26]Our review of the time entries on the "billing statement" Attorney Sallee furnished to the BPR shows she spent many hours on activities for which an attorney with sufficient experience in wrongful death actions to command $250 per hour would not have spent his or her billable time. This indicates that the rate Attorney Sallee sought to charge the Claimants was not commensurate with her experience and ability.

Based on our careful review of the record, and considering all of Attorney's Sallee's conduct with regard to the fees she sought to charge the Claimants, we find material and substantial evidence to support the Panel's determination that Attorney Sallee violated Rules 1.4 and 1.5 of the Tennessee Rules of Professional Conduct, as well as the decision of the trial court on this issue.

*Excessive Sanctions*

Attorney Sallee argues that her suspension of one year is excessive given the fact that she has never been admonished or sanctioned by the BPR in the past. She argues that the one-year suspension is disproportionate to sanctions imposed on other lawyers for similar conduct and not appropriate under the American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards").[27] She argues that the Panel abused it discretion in imposing the one-year suspension.

We have carefully considered this argument, particularly in view of the fact that Attorney Sallee has no prior history of ethical misconduct. Given the facts presented by this case, we cannot find that the Panel abused its discretion in imposing a one-year suspension.

"A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" Eldridge v. Eldridge, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)). Under the abuse of discretion standard, the ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." State v. Scott, 33 S.W.3d 746, 752 (Tenn. 2000); State v. Gilliland, 22 S.W.3d 266, 273 (Tenn. 2000).

As referenced by Attorney Sallee, the ABA Standards are guidelines to be used in determining the appropriate level of discipline for lawyer misconduct. Hanzelik v. Bd. of Prof'l Responsibility of Supreme Court, 380 S.W.3d 669, 681 (Tenn. 2012); Lockett, 380 S.W.3d at 25-27; Rayburn, 300 S.W.3d at 664 (Tenn. 2009). "They also promote the 'consideration of all factors relevant to imposing the appropriate level of sanction in an individual case.'" Hanzelik, 380 S.W.3d at 681 (quoting Lockett, 380 S.W.3d at 28). In our consideration of the sanctions imposed, "we are required to review all of the circumstances of the particular case and also, for the sake of uniformity, sanctions imposed in other cases presenting similar circumstances." Rayburn, 300 S.W.3d at 664 (citing Bd. of Prof'l

---

[27] American Bar Association, *Standards for Imposing Lawyer Sanctions* (2005), available at http://www.americanbar.org/groups/professional_responsibility/resources/lawyer_ethics_regulation/model_rules_for_lawyer_disciplinary_enforcement.html.

Responsibility v. Allison, 284 S.W.3d 316, 327 (Tenn. 2009); Maddux, 148 S.W.3d at 40).

After reviewing the relevant ABA Standards at issue and the factors set forth,[28] we find comparable suspensions imposed in cases involving unreasonable or improper fees, and also in cases involving the improper withdrawal from representation and other similar misconduct, under ABA Standard 7.0.[29] See Threadgill, 299 S.W.3d at 799-800 (affirming one-year suspension based on attorney's failure to communicate with client about status of her case through a prompt accounting and for violations under Rules 1.4, 1.16, and 8.4, among other violations involving client funds); In re Conduct of Knappenberger, 186 P.3d 272, 283-84 (Or. 2008) (suspending attorney's license for two years citing ABA Standard 7.0 and "the sheer number and variety of his disciplinary rule violations" including excessive billing and giving only moderate weight to the accused's prior disciplinary record); In re Disciplinary Proceeding Against Bros., 70 P.3d 940, 945-47 (Wash. 2003) (upholding one-year suspension under ABA Standard 7.0 for charging grossly unreasonable fee when attorney's only other disciplinary offense occurred after the charge in question); In re Gerard, 548 N.E.2d 1051, 1062-63 (Ill. 1989) (imposing one-year suspension where attorney, in first-time offense, charged grossly unreasonable fee for very little legal work based in part on attorney's "self-justifying view of his conduct").

Under ABA Standard 7.2, "Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system." Here, Attorney Sallee not only knowingly failed to communicate with the Claimants regarding her rapidly accruing fees, she also brazenly refused to comply with her duty to surrender to the Claimants items such as the brain tissue slides from their daughter's autopsy. When her former clients sued

---

[28] Section 3.0 of the ABA Standards requires that four factors be considered: (1) the duty violated; (2) the lawyer's mental state; (3) the potential or actual injury caused by the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors. Rayburn, 300 S.W.3d at 664 (citing ABA Standard 3.0). "Consideration of these factors may be accomplished by answering the following four questions: '(1) What ethical duty did the lawyer violate? (A duty to a client, the public, the legal system, or the profession?); (2) What was the lawyer's mental state? (Did the lawyer act intentionally, knowingly, or negligently?); (3) What was the extent of the actual or potential injury caused by the lawyer's misconduct? (Was there a serious or potentially serious injury?); and (4) Are there any aggravating or mitigating circumstances?'" Maddux, 409 S.W.3d at 624 (quoting ABA Standards, Theoretical Framework).

[29] Standard 7.0 states that, except when aggravating or mitigating circumstances are present, "the following sanctions [including suspension] are generally appropriate in cases involving false or misleading communication about the lawyer or the lawyer's services, improper communication of fields of practice, improper solicitation of professional employment from a prospective client, unreasonable or improper fees, unauthorized practice of law, improper withdrawal from representation, or failure to report professional misconduct."

her to regain the items, she responded by threatening them with legal action and even criminal prosecution.

In choosing to impose a one-year suspension, the Panel found five aggravating factors: (1) a dishonest and selfish motive; (2) a pattern of misconduct; (3) multiple offenses; (4) refusal to acknowledge the wrongfulness of her conduct; and (5) indifference to making restitution. It found only one mitigating factor: the absence of a prior disciplinary record. Attorney Sallee vigorously disputes the aggravating factors. She asserts, in effect, that she did "NO HARM," that the "conduct alleged was d[e] minimus," and that her efforts benefitted her clients.

We disagree. The Panel's finding on all five aggravating factors is well supported in the record. Indeed, Attorney Sallee's argument on this issue highlights perhaps the most disturbing of the aggravating factors present in this case: Attorney Sallee's obdurate insistence that she did nothing wrong. At every turn in these proceedings, faced with findings at every level that her conduct breached numerous ethical rules, Attorney Sallee has been doggedly unrepentant. Indeed, her consistent response has bordered on righteous indignation. Under all of these circumstances, we find ample support for the one-year suspension in this case.

*Applicable Version of Rules*

Attorney Sallee argued for the first time before the trial court that some of the Rules of Professional Conduct the Panel applied in this case were outdated and that some of the alleged conduct should be adjudicated under the a newer version of the Rules of Professional Conduct. She reprises that argument in her appeal to this Court.

Beginning on January 1, 2011, the Courts adopted an amended version of the Rules of Professional Conduct, set forth in Tennessee Supreme Court Rule 8. Attorney Sallee contends that the petition for discipline filed against her by the Board cited only the pre-2011 Rules, so the Panel erred by making its determinations under outdated rules. While her argument mentions other Rules,[30] it primarily centers on Rule 1.16(d), which addresses a lawyer's conduct after discharge by a client, and specifically the failure to return items to the former client. The Claimants terminated Attorney Sallee's representation on January 3, 2011,

---

[30] The violations of Rules 1.4 and 1.5, involving communication and unreasonable fees, took place prior to the January 1, 2011 amendment to the Rules of Professional Conduct. The language in Rule 4.4, involving threats to present criminal or lawyer disciplinary charges, and Rule 8.4, involving several types of misconduct, remained substantially the same. Thus, we limit our analysis on this issue to Rule 1.16(d), involving misconduct by a lawyer who is discharged by a client.

so she argues that any failure to return items to her former clients occurred after the January 1, 2011 effective date and would be governed by the newer version of the Rules.[31]

Clearly the specter of waiver is raised, since Attorney Sallee failed to raise this concern in the proceedings before the BPR hearing panel. Nevertheless, assuming for purposes of appeal that there has been no waiver, Attorney Sallee has pointed to no difference between the new and old versions of Rule 1.16(d) that would have affected the

---

[31] Tenn. Sup. Ct. R. 8, Rule 1.6 (2012) (effective Jan. 1, 2011). Prior to January 1, 2011, Rule 1.16(d), as cited in the Board's petition for discipline, stated in relevant part as follows:

> (d) Upon termination of the representation of a client, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, including:
>
> . . .
>
> > (2) promptly surrendering papers and property of the client and any work product prepared by the lawyer for the client and for which the lawyer has been compensated;
> >
> > (3) promptly surrendering any other work product prepared by the lawyer for the client, provided, however, that the lawyer may retain such work product to the extent permitted by other law but only if the retention of the work product will not have a materially adverse affect on the client with respect to the subject matter of the representation; . . .

Tenn. Sup. Ct. R. 8, RPC 1.16(d)(2)-(3) (2010); see also Saroff v. Cohen, No. E2008-00612-COA-R3-CV, 2009 WL 482498, at *6 (Tenn. Ct. App. Feb. 25, 2009). As amended in on January 1, 2011, Rule 1.16(d) states in relevant part as follows:

> (d) *A lawyer who is discharged by a client*, . . . shall, to the extent reasonably practicable, take steps to protect the client's interests. *Depending on the circumstances*, protecting the client's interests may include: . . .
>
> > *(3) cooperating with any successor counsel engaged by the client;*
> >
> > (4) promptly surrendering papers and property to which the client is entitled and any work product prepared by the lawyer for the client and for which the lawyer has been compensated;
> >
> > (5) promptly surrendering any other work product prepared by the lawyer for the client, provided, however, that the lawyer may retain such work product to the extent permitted by other law but only if the retention of the work product will not have a materially adverse affect on the client with respect to the subject matter of the representation . . . .

Tenn. Sup. Ct. R. 8, RPC 1.16(d)(3)-(5) (2012) (differences italicized).

Panel's decision. See Skouteris, 430 S.W.3d at 366 n. 3 (Tenn. 2014) (noting that, in a case that involved violations occurring before and after January 1, 2011 amendments to the Rules of Professional Conduct, "there are no substantive differences between the two sets of Rules that apply to the violations at issue in this case"). She has failed to show any prejudice that resulted from application of the pre-amendment version.

Attorney Sallee argues that the Panel's finding of a violation of Rule 1.16 is not supported by substantial and material evidence because there was no showing that the Claimants suffered any harm from her decision to withhold items from them after they terminated her representation. See Tenn. Sup. Ct. R. 8, RPC 1.16 cmt. 9. This argument is spurious. Attorney Sallee refused to return key items to the Claimants, such as their deceased daughter's medical records and brain tissue slides from her autopsy and which had been specifically requested by the Claimants' expert, Dr. Wecht. The Claimants were forced to expend an additional $10,000 to file a separate lawsuit against Attorney Sallee to obtain their return. Attorney Sallee did not return the items to the Claimants until the Knox County Chancery Court ordered her to do so.[32] This process delayed the wrongful death case for two to three months.

For these reasons, we find that this argument is without merit.

*Threatening Emails*

Attorney Sallee's final argument focuses on the emails that she sent the Claimants' new attorney, Attorney Vaughan, threatening legal action and criminal charges against the Claimants if they did not accede to her demand that they dismiss the lawsuit to obtain the withheld items. Attorney Sallee contends that the Panel's finding that she violated Rule 4.4[33] is not supported by substantial and material evidence because Attorney Vaughan did not testify at the evidentiary hearing, so the emails containing the threats were not authenticated and there is no proof in the record that Attorney Vaughan actually received the emails.

---

[32]We note that the new version of the Rule 1.16(d) added subsection (3), which requires cooperation with the former clients' successor counsel. Attorney Sallee's response was the opposite.

[33] Prior to the January 1, 2011 amendment, Rule 4.4 stated: "In representing a client, a lawyer shall not: . . . (b) threaten to present a criminal charge, or to offer to agree to refrain from filing such a charge, for the purpose of obtaining an advantage in a civil matter. Tenn. Sup. Ct. R. 8, RPC 1.16(b) (2010). After the January 1, 2011 amendment, Rule 4.4 states: "(a) In representing a client, a lawyer shall not: . . . (2) threaten to present a criminal or lawyer disciplinary charge for the purpose of obtaining an advantage in a civil matter." Tenn. Sup. Ct. R. 8, RPC 1.16(a)(2) (2012) (effective Jan. 1, 2011). As noted above, the differences in the language in Rule 4.4 do not affect our consideration of the issues raised in this appeal.

We reject this argument as well. First, the record contains a letter from Larry Vaughan in which he acknowledges that he received the emails. This letter was attached as an exhibit to the BPR complaint that was before the Panel.

Moreover, the violation of Rule 4.4 occurred when Attorney Sallee sent the emails; proof that Attorney Vaughan received the threatening emails is not required. Tenn. Sup. Ct. R. 8, RPC 4.4(a)(2) (2012) (stating that Rule 4.4 provides that a lawyer shall not "threaten to present a criminal or lawyer disciplinary charge for the purpose of obtaining an advantage in a civil matter"). Despite Attorney Sallee's circumlocution in her testimony about whether she intended to send the emails, she ultimately admitted that she in fact sent them. Without question, the emails violate Rule 4.4, as found by the Panel. This argument is without merit.

## Conclusion

After an exhaustive review of the record, we hold that the findings made by the Panel are supported by substantial and material evidence. The decisions made by the Panel were neither arbitrary nor capricious and were not characterized by an abuse of discretion. We hold that the Panel's findings and the sanctions imposed are well supported by the record. All other issues raised on appeal are pretermitted by this decision.[34]

The decision of the trial court is affirmed. Costs of this appeal are taxed to the Appellant Yarboro Sallee and her surety, for which execution may issue if necessary.

_____
HOLLY KIRBY, JUSTICE

---

[34] In addition to the arguments raised on appeal, Attorney Sallee has filed several subsequent motions with the Court, including "Appellant's Motion to Dismiss Petition for the Appellee/Plaintiffs' Intentional and Bad Faith Misconduct in Concealing Critical Docum[e]ntation and Proof from Petitioner and/or the Deliberate Effective Spoilation [sic] of Critical Evidentiary Proof and Documentation" filed on March 17, 2015. In response to this motion, the BPR asks the Court to impose sanctions on Attorney Sallee; it cites no authority in support of this request. After careful consideration, these motions are denied.